# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 4, 2009    Decided September 18, 2009

No. 08-5422

EMILY'S LIST,
APPELLANT

v.

FEDERAL ELECTION COMMISSION,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-00049-CKK)

---

*Robert F. Bauer* argued the cause for appellant. With him on the briefs were *Ezra W. Reese* and *Brian G. Svoboda*.

*David Kolker*, Associate General Counsel, Federal Election Commission, argued the cause for appellee. With him on the brief were *Thomasenia P. Duncan*, General Counsel, *Harry J. Summers*, Assistant General Counsel, and *Vivien Clair*, Attorney. *Gregory J. Mueller*, Attorney, entered an appearance.

*Donald J. Simon*, *Fred Wertheimer*, *J. Gerald Hebert*, *Trevor Potter*, and *Paul S. Ryan* were on the brief for *amici*

*curiae* Campaign Legal Center and Democracy 21 in support of appellee.

Before: HENDERSON, BROWN, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, with whom *Circuit Judge* HENDERSON joins, and with whom *Circuit Judge* BROWN joins as to Part IV except footnotes 17, 18, and 20.

Opinion concurring in part filed by *Circuit Judge* BROWN.

KAVANAUGH, *Circuit Judge*: A non-profit group known as EMILY's List promotes abortion rights and supports pro-choice Democratic women candidates. It challenges several new Federal Election Commission regulations that restrict how non-profits may spend and raise money to advance their preferred policy positions and candidates. EMILY's List argues that the regulations violate the First Amendment.

The First Amendment, as interpreted by the Supreme Court, protects the right of individual citizens to spend unlimited amounts to express their views about policy issues and candidates for public office. Similarly, the First Amendment, as the Court has construed it, safeguards the right of citizens to band together and pool their resources as an unincorporated group or non-profit organization in order to express their views about policy issues and candidates for public office. We agree with EMILY's List that the new FEC regulations contravene those principles and violate the First Amendment. We reverse the judgment of the District Court and direct it to enter judgment for EMILY's List and to vacate the challenged regulations.

3

I

In the wake of the 2002 Bipartisan Campaign Reform Act and the Supreme Court's 2003 decision in *McConnell v. FEC*, the election season of 2004 erupted with bitter accusations about the activities of certain non-profit entities. The controversy was popularly known by a single term – "527s" – that refers to the section of the tax code applicable to non-profits engaged in political activities. The debate arose after wealthy individuals contributed huge sums of money to non-profits ranging from America Coming Together to MoveOn.org to Swift Boat Veterans for Truth in order to support advertisements, get-out-the-vote efforts, and voter registration drives. In total during the 2004 campaign, these groups reportedly spent several hundred million dollars.

As the campaign unfolded, many in both major parties – including President Bush and Senator Kerry – questioned the activities of certain non-profits. Some encouraged the FEC to ban large donations to non-profit entities in the same way that Congress in BCRA had banned large contributions to political parties. Proponents of additional regulation reasoned that non-profits had replaced political parties as the soft-money "loophole" in the campaign finance system. *See* Edward B. Foley & Donald Tobin, *The New Loophole?: 527s, Political Committees, and McCain-Feingold*, BNA MONEY & POL. REP., Jan. 7, 2004.

In response, the FEC did not *ban* non-profits from receiving and spending large donations, as some had urged. But the FEC did *limit* how much non-profits such as EMILY's List could raise and spend. The FEC achieved this objective by dictating that covered non-profits pay for a large percentage of election-related activities out of their hard-

money accounts. *See* 11 C.F.R. §§ 106.6(c), (f).[1] Because donations to those hard-money accounts are capped at $5000 annually for individual contributors, the FEC's allocation regulations substantially restrict the ability of non-profits to spend money for election-related activities such as advertisements, get-out-the-vote efforts, and voter registration drives. The regulations separately require that donations to non-profits be considered hard money subject to the $5000 cap if the corresponding solicitation indicated that donations would be used to support the election or defeat of a federal candidate. *See id.* § 100.57.

In early 2005, EMILY's List filed suit, arguing that the new regulations violated the First Amendment and the Federal Election Campaign Act. In 2008, the District Court upheld the regulations in their entirety.

## II

To assess the constitutionality of the new FEC regulations, we initially must address at some length the relevant First Amendment principles set forth by the Supreme Court.

## A

Ratified in 1791, the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. This guarantee "has its fullest and most urgent application precisely to the conduct of

---

[1] A hard-money account is subject to source and amount limitations. For example, under the statute, EMILY's List cannot accept donations of more than $5000 annually into its hard-money account from any single contributor. 2 U.S.C. § 441a(a)(1)(C). A soft-money account may receive unlimited donations.

campaigns for political office." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (internal quotation marks omitted). The Amendment "protects political association as well as political expression." *Id.*; *see also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958).

In analyzing the interaction of the First Amendment and campaign finance laws, the Court has articulated several overarching principles of relevance here.

*First*, the Court has held that campaign contributions and expenditures constitute "speech" within the protection of the First Amendment. In *Buckley*, the foundational case, the Court definitively ruled that "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities." 424 U.S. at 14. The Court has never strayed from that cardinal tenet, notwithstanding some passionate objections. *See, e.g.*, *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 398 (2000) (Stevens, J., concurring) ("Money is property; it is not speech."); J. Skelly Wright, *Politics and the Constitution: Is Money Speech?*, 85 YALE L.J. 1001 (1976).

*Second*, the Court has ruled that the Government cannot limit campaign contributions and expenditures to achieve "equalization" – that is, it cannot restrict the speech of some so that others might have equal voice or influence in the electoral process. In perhaps the most important sentence in the Court's entire campaign finance jurisprudence, *Buckley* stated: "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." 424 U.S. at 48-49. The Court added that the Government's interest in "equalizing the relative ability of

individuals and groups to influence the outcome of elections" does not justify regulation. *Id.* at 48.

In *Davis v. FEC*, the Court strongly reiterated that "equalization" is not a "legitimate government objective." 128 S. Ct. 2759, 2773 (2008). The *Davis* Court approvingly quoted Justice Kennedy's observation in *Austin v. Michigan State Chamber of Commerce* that "the notion that the government has a legitimate interest in restricting the quantity of speech to equalize the relative influence of speakers on elections" is "antithetical to the First Amendment." *Id.* (citation and internal quotation marks omitted); *see also Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652, 684 (1990) (Scalia, J., dissenting) ("This illiberal free-speech principle of 'one man, one minute' was proposed and soundly rejected in *Buckley*").[2]

*Third*, the Court has recognized a strong governmental interest in combating corruption and the appearance thereof. *See Buckley*, 424 U.S. at 26-27, 45-48; *see also McConnell v. FEC*, 540 U.S. 93, 154 (2003). This, indeed, is the only interest the Court thus far has recognized as justifying campaign finance regulation. *Davis*, 128 S. Ct. at 2773 ("Preventing corruption or the appearance of corruption are

---

[2] The Court's rejection of the equalization argument is consistent with its broader First Amendment jurisprudence: "As a general matter, the American First Amendment tradition requires that the financial, political, or rhetorical imbalance between the proponents of competing arguments is insufficient to justify government intervention to correct that imbalance." Frederick Schauer & Richard H. Pildes, *Electoral Exceptionalism and the First Amendment*, 77 TEX. L. REV. 1803, 1825 (1999); *see generally* Lillian R. BeVier, *Money and Politics: A Perspective on the First Amendment and Campaign Finance Reform*, 73 CAL. L. REV. 1045 (1985).

the only legitimate and compelling government interests thus far identified for restricting campaign finances.") (citation and internal quotation marks omitted). Importantly, the Court has emphasized that the anti-corruption rationale is not boundless. The core corruption that Government may permissibly target with campaign finance regulation "is the financial *quid pro quo:* dollars for political favors." *FEC v. Nat'l Conservative PAC* (*NCPAC*), 470 U.S. 480, 497 (1985). This anti-corruption interest is implicated by contributions to *candidates*: "To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined." *Buckley*, 424 U.S. at 26-27; *see also Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 296-97 (1981) ("*Buckley* identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment"; the exception relates "to the perception of undue influence of large contributors to a *candidate*"). Based on the close relationship between candidates and parties and record evidence demonstrating that political parties sold access to candidates in exchange for contributions, the Court has held that the anti-corruption interest also justifies limits on contributions to *parties*. *See McConnell*, 540 U.S. at 154; *see also Buckley*, 424 U.S. at 38.[3]

*Fourth*, in applying the anti-corruption rationale, the Court has afforded stronger protection to *expenditures* by citizens and groups (for example, for advertisements, get-out-the-vote efforts, and voter registration activities) than it has

---

[3] Contributions include coordinated expenditures – that is, expenditures coordinated with a candidate or party. *See McConnell*, 540 U.S. at 121; *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 443 (2001); *see also* 2 U.S.C. § 441a(a)(7)(B).

provided to their *contributions* to candidates or parties. The Court has explained that contributions to a candidate or party pose a greater risk of *quid pro quo* corruption than do expenditures. *See Buckley*, 424 U.S. at 46-47. At the same time, the Court has stated that limits on contributions to candidates or parties pose only a "marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20-21. By contrast, expenditure restrictions limit "political expression at the core of our electoral process and of the First Amendment freedoms." *Id.* at 39 (internal quotation marks omitted). A "restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 19. The Court's jurisprudence, in short, reflects a "fundamental constitutional difference between money *spent* to advertise one's views independently of the candidate's campaign and money *contributed* to the candidate to be spent on his campaign." *NCPAC*, 470 U.S. at 497 (emphases added); *see also Randall v. Sorrell*, 548 U.S. 230, 241-42 (2006).[4]

---

[4] Many have criticized the distinction between contributions and expenditures because, in their view, they are "two sides of the same First Amendment coin." *Buckley*, 424 U.S. at 241 (opinion of Burger, C.J.). Some contend that limits on contributions and expenditures are both suspect under the First Amendment. *See id.*; *id.* at 290 (opinion of Blackmun, J); *see also Shrink Mo. Gov't PAC*, 528 U.S. at 410 (Thomas, J., dissenting). Others argue that the interest in limiting contributions similarly justifies restricting expenditures. *See Buckley*, 424 U.S. at 260-62 (opinion of White, J.). The Court thus far has rebuffed both critiques and adhered to the *Buckley* divide. *See Randall*, 548 U.S. at 242 ("Over the last 30 years, in considering the constitutionality of a host of different

In maintaining this line between (i) contributions to candidates or parties and (ii) expenditures, the Court has acknowledged that a citizen's or group's large expenditure – for example, in financing advertisements or get-out-the-vote activities – may confer some benefit on a candidate and thereby give influence to the spender. But the Court nonetheless has consistently dismissed the notion that expenditures implicate the anti-corruption interest. *See Buckley*, 424 U.S. at 47 (expenditures not "a *quid pro quo* for improper commitments from the candidate"); *see also McConnell*, 540 U.S. at 153 ("mere political favoritism or opportunity for influence alone is insufficient to justify regulation"); *id.* at 156-57 n.51 (Congress could not regulate talk show hosts or newspaper editors "on the sole basis that their activities conferred a *benefit* on the candidate"); *NCPAC*, 470 U.S. at 498 ("exchange of political favors for uncoordinated expenditures remains a hypothetical possibility and nothing more").

*Fifth*, the Court has been somewhat more tolerant of regulation of for-profit corporations and labor unions. The Court has permitted statutory limits on contributions that for-profit corporations and unions make from their general treasuries to candidates and parties.[5] More controversially, the Court has carved out a significant exception to *Buckley*'s holding on expenditures: The Court has upheld laws that prohibit for-profit corporations and unions from making expenditures for activities expressly advocating the election

campaign finance statutes, this Court has repeatedly adhered to *Buckley*'s constraints, including those on expenditure limits.").

[5] The Court also has ruled that the Government may bar certain non-profit as well as for-profit corporations from making direct contributions to candidates or parties. *See FEC v. Beaumont*, 539 U.S. 146, 159-60 (2003).

or defeat of a federal candidate. The Court has permitted those expenditure limits on the ground that they restrain the "corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." *Austin*, 494 U.S. at 660; *see also McConnell*, 540 U.S. at 204-05; *but see First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776-77 (1978); *Buckley*, 424 U.S. at 48-49.[6]

To sum up so far: In reconciling the competing interests, the Supreme Court has generally approved statutory limits on *contributions* to candidates and political parties as consistent with the First Amendment. The Court has rejected *expenditure* limits on individuals, groups, candidates, and parties, even though expenditures may confer benefits on candidates. And the Court has upheld limits on for-profit corporations' and unions' use of their general treasury funds to make campaign contributions to candidates or political parties or to make expenditures for activities expressly advocating the election or defeat of federal candidates.

B

This case does not involve regulation of candidates, parties, or for-profit corporations. Rather, this case concerns

---

[6] The Supreme Court is presently considering whether to overrule *Austin* (and *McConnell*'s reliance on it) to the extent *Austin* permitted the Government to limit for-profit corporations' and unions' expenditures. *See Citizens United v. FEC*, No. 08-205 (S. Ct. reargued Sept. 9, 2009); *cf. Austin*, 494 U.S. at 702 (Kennedy, J., dissenting) ("Today's decision abandons [*Buckley*'s] distinction and threatens once-protected political speech."). The regulations at issue here violate the First Amendment with or without *Austin* on the books. *See infra* note 11.

the FEC's regulation of *non-profit entities* that are not connected to a candidate, party, or for-profit corporation. We thus must consider how the constitutional principles outlined above apply to non-profits – and in particular to three different kinds of non-profits: (i) those that only make expenditures; (ii) those that only make contributions to candidates or parties; and (iii) those that do both. For purposes of the First Amendment analysis, the central issue turns out to be whether independent non-profits are treated like individual citizens (who under *Buckley* have the right to spend unlimited money to support their preferred candidates) or like political parties (which under *McConnell* do not have the right to raise and spend unlimited soft money).[7]

1

The first relevant category of non-profit entities consists of those that only make expenditures for political activities such as advertisements, get-out-the-vote efforts, and voter

---

[7] In referring to non-profit entities, we mean non-connected non-profit corporations (usually advocacy or ideological or politically oriented non-profits) that engage in election-related activities and register with the Internal Revenue Service under 26 U.S.C. § 527 or § 501(c), as well as unincorporated non-profit groups. "Non-connected" means that the non-profit is not a candidate committee, a party committee, or a committee established by a corporation or labor union. *See* 11 C.F.R. § 106.6(a). "Non-connected" for purposes of this opinion also excludes so-called leadership PACs.

Some non-profits register with the FEC as political committees; others do not. Our constitutional analysis of donations to and spending by non-connected non-profits applies regardless whether a non-profit has registered as a political committee with the FEC. *See infra* note 15.

registration drives. Non-profits in this category make no contributions to federal candidates or parties.

The Supreme Court's case law establishes that those non-profit entities, like individual citizens, are constitutionally entitled to raise and spend unlimited money in support of candidates for elected office – with the narrow exception that, under *Austin*, the Government may restrict to some degree how non-profits spend donations received from the general treasuries of for-profit corporations or unions. *See Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 202-03 (1981) (opinion of Blackmun, J.); *see also FEC v. Mass. Citizens for Life, Inc. (MCFL)*, 479 U.S. 238, 259-65 (1986); *NCPAC*, 470 U.S. at 501; *Citizens Against Rent Control*, 454 U.S. at 296-99; *Buckley*, 424 U.S. at 47; *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 292-93 (4th Cir. 2008).

Those principles were initially articulated in *Cal-Med*. There, Justice Blackmun determined that "contributions to political committees can be limited only if those contributions implicate the governmental interest in preventing actual or potential corruption, and if the limitation is no broader than necessary to achieve that interest." *Cal-Med*, 453 U.S. at 203 (opinion of Blackmun, J.). Applying that standard, he found that "contributions to a committee that makes only independent expenditures pose no such threat" of "actual or potential corruption." *Id.* "By pooling their resources, adherents of an association amplify their own voices; the association is but the medium through which its individual members seek to make more effective the expression of their own views." *Id.* (citation and internal quotation marks omitted). Justice Blackmun thus concluded that Government

may not limit contributions to a non-profit that only makes expenditures.[8]

The Court reinforced those principles a year later in *Citizens Against Rent Control.* There, the Court struck down limits on donations to a non-profit committee seeking to defeat a ballot measure. *See Citizens Against Rent Control*, 454 U.S. at 296-99. Building on the established right of individuals to make unlimited expenditures, the Court stated that there are "of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them." *Id.* at 296. The Court further reasoned: "Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression." *Id.* at 299. In the Court's words, to place "a Spartan limit – or indeed any limit – on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association." *Id.* at 296.

---

[8] In *Cal-Med*, there was no majority opinion on the First Amendment issue. Under the *Marks* principle, Justice Blackmun's opinion in *Cal-Med* appears to be controlling. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *cf., e.g.*, *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 269-320 (1978) (opinion of Powell, J.). Even if Justice Blackmun's opinion were not binding under the *Marks* principle or even if his discussion of expenditure-only non-profits were considered dicta, his opinion's principles have been followed in subsequent decisions such as *Citizens Against Rent Control*. In that regard, we note that Justice Marshall's opinion in *Cal-Med* did not decide how the First Amendment applies to contributions to a non-profit that only makes expenditures. *See Cal-Med*, 453 U.S. at 197 n.17 (opinion of Marshall, J.) ("American Civil Liberties Union suggests that § 441a(a)(1)(C) would violate the First Amendment if construed to limit the amount individuals could jointly expend to express their political views. We need not consider this hypothetical application . . . .").

In *NCPAC*, the Court reiterated that the Government may not limit the spending of non-profits. The Court invalidated a law that restricted a group's expenditures in support of a candidate who had accepted public financing. *See NCPAC*, 470 U.S. at 501. The Court stated that citizens' "collective action in pooling their resources to amplify their voices" is "entitled to full First Amendment protection . . . ." *Id.* at 495.

In *MCFL*, the Court again underscored that non-profit advocacy groups are generally entitled to raise and spend unlimited money on elections. The Court invalidated an expenditure limit imposed on a non-profit corporation that had distributed a newsletter promoting pro-life candidates. The Court noted that individuals "contribute to a political organization in part because they regard such a contribution as a more effective means of advocacy than spending the money under their own personal direction." *MCFL*, 479 U.S. at 261. The Court added that "[v]oluntary political associations do not suddenly present the specter of corruption merely by assuming the corporate form." *Id.* at 263; *see also Austin*, 494 U.S. at 701 (Kennedy, J., dissenting) (*MCFL* held that "a nonprofit corporation engaged in political discussion of candidates and elections has the full protection of the First Amendment"). Adhering to *MCFL*, the *McConnell* Court ruled that BCRA's ban on certain electioneering communications could not validly be applied to non-profit corporations. *See McConnell*, 540 U.S. at 210-11.

The principles set forth in *Cal-Med*, *Citizens Against Rent Control*, *NCPAC*, and *MCFL* are rooted in the Court's consistent holdings beginning with *Buckley* that individual citizens may spend money without limit (apart from the limit on their own contributions to candidates or parties) in support of the election of particular candidates. After all, if one

person is constitutionally entitled to spend $1 million to run advertisements supporting a candidate (as *Buckley* held), it logically follows that 100 people are constitutionally entitled to donate $10,000 each to a non-profit group that will run advertisements supporting a candidate.[9] Put another way: "If the First Amendment prohibits any limitation on how much money an independent political committee can spend on an independent-expenditure campaign, how can it permit limits on donations to committees that make only independent expenditures?" Richard Briffault, *The 527 Problem and the* Buckley *Problem*, 73 GEO. WASH. L. REV. 949, 982 (2005); *see also* Edward B. Foley, *The "Major Purpose" Test: Distinguishing Between Election-Focused and Issue-Focused Groups*, 31 N. KY. L. REV. 341, 343 (2004) (stating "baseline proposition that it would be unconstitutional to limit the contributions that individuals may give to ideological groups to be used for electoral purposes"); Note, *The Unconstitutionality of Limitations on Contributions to Political Committees in the 1976 Federal Election Campaign Act Amendments*, 86 YALE L.J. 953 (1977).

These Supreme Court decisions reflect, moreover, the commonsense proposition that regulation of non-profits does not fit within the anti-corruption rationale, which constitutes

---

[9] To be sure, some cases suggest that the First Amendment interest in donating to someone else for speech, while important, is less weighty than the First Amendment interest in speaking oneself. But those cases involve contributions to candidates or parties. *See Buckley*, 424 U.S. at 21. With respect to donations to groups other than candidates or political parties, the Court has said that there are "of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them." *Citizens Against Rent Control*, 454 U.S. at 296; *see also MCFL*, 479 U.S. at 261; *NCPAC*, 470 U.S. at 495; *Cal-Med*, 453 U.S. at 203 (opinion of Blackmun, J.); *NAACP*, 357 U.S. at 460.

the sole basis for regulating campaign contributions and expenditures. *See Davis*, 128 S. Ct. at 2773. As the Court has explained the anti-corruption principle, mere *donations* to non-profit groups cannot corrupt candidates and officeholders. In the words of the Fourth Circuit, it is "implausible that contributions to independent expenditure political committees are corrupting." *N.C. Right to Life*, 525 F.3d at 293 (internal quotation marks omitted). And to the extent a non-profit then *spends* its donations on activities such as advertisements, get-out-the-vote efforts, and voter registration drives, those expenditures are not considered corrupting, even though they may generate gratitude from and influence with officeholders and candidates. Rather, under *Buckley*, those expenditures are constitutionally protected. Therefore, limiting donations to and spending by non-profits in order to prevent corruption of candidates and officeholders represents a kind of "prophylaxis-upon-prophylaxis" regulation to which the Supreme Court has emphatically stated, "Enough is enough." *FEC v. Wis. Right to Life, Inc.* (*WRTL*), 551 U.S. 449, 478-79 (2007) (controlling opinion of Roberts, C.J.).

Writing for the Fourth Circuit, Judge Wilkinson recently summarized the relevant Supreme Court precedents, concluding that "the Court has *never* held that it is constitutional to apply contribution limits to political committees that make solely independent expenditures." *N.C. Right to Life*, 525 F.3d at 292. Those non-profit groups receive full First Amendment protection and are entitled to receive donations and make expenditures because they "offer an opportunity for ordinary citizens to band together to speak on the issue or issues most important to them." *Id.* at 295. We agree with Judge Wilkinson's assessment of the state of the law.

2

The second relevant category of non-profits consists of those that only make contributions to federal candidates or political parties and make no expenditures. Given the constitutionally permissible caps on an individual donor's contributions to candidates or parties, the Supreme Court has acknowledged the risk that individuals might use non-profits to evade those limits. In order to prevent circumvention of limits on an individual donor's contributions to candidates and parties, the Court has held that non-profit entities can be required to make their own contributions to candidates and parties, as well as pay associated administrative expenses, out of a hard-money account that is subject to source and amount restrictions. *See Cal-Med*, 453 U.S. at 198-99 (opinion of Marshall, J.); *id.* at 203-04 (opinion of Blackmun, J.). As a majority of the Court pointed out in *Cal-Med*, doing so prevents non-profits from being used as "conduits" for illegal contributions to parties and candidates and thus prevents "evasion of the limitations on contributions" to a candidate. *Id.* at 203 (opinion of Blackmun, J.); *see also id.* at 198 (opinion of Marshall, J.) (limit on donations to non-profit prevents evasion of "$1,000 limit on contributions to candidates . . . by channeling funds" through the non-profit); *Cal. Med. Ass'n v. FEC*, 641 F.2d 619, 625 (9th Cir. 1980) (Kennedy, J.) (non-profit committee is "natural conduit for candidate contributions and . . . the essential purpose of the provision here in question *is to limit those contributions, not to limit expenditures for any other type of political advocacy*") (emphasis added).[10]

---

[10] The requirement that certain administrative expenses be funded in part with hard money prevents a contributor from essentially taking control of a non-profit and thereby circumventing limits on individual contributions to candidates. *See Cal-Med*, 453 U.S. at 198-99 n.19 (opinion of Marshall, J.); *id.* at 203 (opinion of

Consistent with *Cal-Med*'s ruling, FECA limits contributors to donating a maximum of $5000 per year to a non-profit's hard-money account. A non-profit in turn may contribute to a candidate or party only from that hard-money account. *See* 2 U.S.C. § 441a(a)(1)(C). And an individual's contribution to a non-profit's hard-money account may count against the individual's aggregate annual contribution limits. *See* 2 U.S.C. § 441a(a)(3).

3

What about a non-profit entity that falls into both categories – in other words, a non-profit that makes expenditures *and* makes contributions to candidates or parties? EMILY's List is a good example of such a hybrid non-profit: It makes expenditures for advertisements, get-out-the-vote efforts, and voter registration drives; it also makes direct contributions to candidates and parties. In all of its activities, its mission is to promote and safeguard abortion rights and to support the election of pro-choice Democratic women to federal, state, and local offices nationwide.

The constitutional principles that govern such a hybrid non-profit entity follow ineluctably from the well-established principles governing the other two categories of non-profits. To prevent circumvention of contribution limits by individual donors, non-profit entities may be required to make their own contributions to federal candidates and parties out of a hard-money account – that is, an account subject to source and

---

Blackmun, J.). But as discussed above, the *Cal-Med* Court never stated that non-profits could be required to use hard money for advertisements, get-out-the-vote activities, and voter registration drives; indeed, Justice Blackmun's opinion stated the opposite.

amount limitations ($5000 annually per contributor). Similarly, non-profits also may be compelled to use their hard-money accounts to pay an appropriately tailored share of administrative expenses associated with their contributions. *See Cal-Med*, 453 U.S. at 198-99 n.19 (opinion of Marshall, J.). But non-profit entities are entitled to make their expenditures – such as advertisements, get-out-the-vote efforts, and voter registration drives – out of a soft-money or general treasury account that is not subject to source and amount limits. Stated another way: A non-profit that makes expenditures to support federal candidates does not suddenly forfeit its First Amendment rights when it decides also to make direct contributions to parties or candidates. Rather, it simply must ensure, to avoid circumvention of individual contribution limits by its donors, that its contributions to parties or candidates come from a hard-money account.[11]

---

[11] One additional wrinkle: To the extent a non-profit receives donations from for-profit corporations or unions, those donations cannot be placed in the non-profit's hard-money account (because for-profit corporate or union donations cannot be the source of contributions to parties or candidates). Moreover, under *Austin*, the soft-money account into which such donations are deposited cannot be used to fund express-advocacy election activities that for-profit corporations and unions are themselves banned from conducting. *Cf. WRTL*, 551 U.S. at 476-77; *MCFL*, 479 U.S. at 259-64; *FEC v. NRA*, 254 F.3d 173, 191-92 (D.C. Cir. 2001). Justice Souter recently summarized these points: A "nonprofit may use its general treasury to pay for clearly electioneering communications so long as it declines to serve as a conduit for money from business corporations and unions (and thus qualifies for the *MCFL* exception)." *WRTL*, 551 U.S. at 521 (Souter, J., dissenting) (internal quotation marks omitted). If *Austin* were overruled, then non-profits would be able to make unlimited express-advocacy expenditures from their soft-money accounts even if they accepted donations from for-profit corporations or unions to those accounts.

## C

How does *McConnell* affect the above principles governing non-profits? *McConnell* upheld congressionally imposed limits on *political parties* receiving or spending soft money. Some have argued that the Government can similarly restrict soft-money contributions to and spending by *non-profits*. In this case, the District Court accepted that reasoning in ruling for the FEC; it found non-profits similarly situated to political parties for purposes of the First Amendment analysis.

In our judgment, however, *McConnell* does not support such regulation of non-profits. *McConnell* affirmed BCRA's limits on contributions to political parties because of the close ties between candidates and parties and the extensive record evidence of what it deemed a threat of actual or apparent corruption – specifically, the *access* to federal officials and candidates that large soft-money contributors to *political parties* received in exchange for their contributions. The Court said that it was "not unwarranted for Congress to conclude that the selling of access gives rise to the appearance of corruption." *McConnell*, 540 U.S. at 154. The Court expressly based its conclusion on the "close relationship between federal officeholders and the national parties, as well as the means by which parties have traded on that relationship . . . ." *Id.*[12]

---

[12] *See generally McConnell*, 540 U.S. at 130 ("both parties promised and provided special access to candidates and senior Government officials in exchange for large soft-money contributions"); *id.* at 145 ("special relationship and unity of interest" that candidates and officeholders share with parties); *id.* at 146 ("The evidence in the record shows that candidates and donors alike have in fact exploited the soft-money loophole, the former to increase their prospects of election and the latter to create debt on the part of officeholders, with the national parties serving as willing

Unlike the political parties examined in *McConnell*, there is no record evidence that non-profit entities have sold access to federal candidates and officeholders in exchange for large contributions. *See also* Craig Holman, *The Bipartisan Campaign Reform Act: Limits and Opportunities for Non-*

intermediaries."); *id.* at 150 ("The record in the present cases is replete with similar examples of national party committees peddling access to federal candidates and officeholders in exchange for large soft-money donations."); *id.* at 151 ("So pervasive is this practice that the six national party committees actually furnish their own menus of opportunities for access to would-be soft-money donors, with increased prices reflecting an increased level of access."); *id.* at 152 ("close ties that candidates and officeholders have with their parties"); *id.* at 153-54 ("As the record demonstrates, it is the manner in which parties have *sold* access to federal candidates and officeholders that has given rise to the appearance of undue influence."); *id.* at 155 ("no meaningful separation between the national party committees and the public officials who control them") (internal quotation marks omitted); *id.* ("Given this close connection and alignment of interests, large soft-money contributions to national parties are likely to create actual or apparent indebtedness on the part of federal officeholders"); *id.* ("This close affiliation has also placed national parties in a position to sell access to federal officeholders in exchange for soft-money contributions"); *id.* ("Access to federal officeholders is the most valuable favor the national party committees are able to give in exchange for large donations."); *id.* at 156 n.51 ("[T]he record demonstrates close ties between federal officeholders and the state and local committees of their parties. That close relationship makes state and local parties effective conduits for donors desiring to corrupt federal candidates and officeholders. Thus, in upholding §§ 323(b), (d), and (f), we rely not only on the fact that they regulate contributions used to fund activities influencing federal elections, but also that they regulate contributions to, or at the behest of, entities uniquely positioned to serve as conduits for corruption.").

*Profit Groups in Federal Elections*, 31 N. KY. L. REV. 243, 280 (2004) ("Today's electioneering non-profit groups . . . can make no such promises of access in exchange for a soft money contribution.").

More fundamentally, non-profit groups do not have the same inherent relationship with federal candidates and officeholders that political parties do. The *McConnell* Court identified numerous "real-world differences between political parties and interest groups." 540 U.S. at 188. "Interest groups do not select slates of candidates for elections. Interest groups do not determine who will serve on legislative committees, elect congressional leadership, or organize legislative caucuses. Political parties have influence and power in the Legislature that vastly exceeds that of any interest group. As a result, it is hardly surprising that party affiliation is the primary way by which voters identify candidates, or that parties in turn have special access to and relationships with federal officeholders." *Id.* As noted in *McConnell*, Congress recognized these differences and enacted a statutory scheme under which "[i]nterest groups . . . remain free to raise soft money to fund voter registration, GOTV activities, mailings," and advertising. *Id.* at 187.

In sum, it will not work to simply transport *McConnell*'s holding from the political party context to the non-profit setting. On this question as well, we agree with Judge Wilkinson: "It is . . . not an exaggeration to say that *McConnell* views political parties as different in kind than independent expenditure committees." *N.C. Right to Life*, 525 F.3d at 293.

For non-profit entities, the most pertinent Supreme Court precedents remain *Buckley*, *Cal-Med*, *Citizens Against Rent Control*, *NCPAC*, and *MCFL*. As discussed above, those

cases ultimately stand for the proposition that non-profit groups may accept unlimited donations to their soft-money accounts. And subject to the one *Austin*-based exception, non-profit groups – like individual citizens – may spend unlimited amounts out of their soft-money accounts for election-related activities such as advertisements, get-out-the-vote efforts, and voter registration drives.[13]

---

[13] Some have suggested that footnote 48 of the *McConnell* opinion, in the course of discussing contributions to parties, subtly re-interpreted *Cal-Med* to permit restrictions on large soft-money donations to non-profits. *See, e.g.*, Edward B. Foley & Donald Tobin, *The New Loophole?: 527s, Political Committees, and McCain-Feingold*, BNA MONEY & POL. REP., Jan. 7, 2004; Memorandum from Prof. Daniel R. Ortiz, Univ. of Va. School of Law, to Democracy 21 and the Campaign Legal Center (Apr. 9, 2004). We decline to adopt that expansive reading of footnote 48.

First, as explained by one leading election-law expert, such a reading would require overruling the Supreme Court's longstanding dichotomy between limits on contributions and expenditures. *See* Richard L. Hasen, Buckley *is Dead, Long Live* Buckley, 153 U. PA. L. REV. 31, 70 (2004). Limits on donations to non-profit entities are analytically akin to limits on expenditures by the donors. *See Cal-Med*, 453 U.S. at 202 (opinion of Blackmun, J.); *see also* Briffault, 73 GEO. WASH. L. REV. at 982 ("[I]f George Soros's direct expenditure of $23 million on anti-Bush or pro-Kerry ads is constitutionally protected, how does he forfeit that protection if he combines his $23 million with $20 million from Peter Lewis and maybe another $10 million from some slightly smaller fry in a fund that takes out essentially the same ads and supports the same voter drives?"). For that reason, a broad interpretation of footnote 48 would mean "the entire *Buckley* edifice . . . falls." Hasen, 153 U. PA. L. REV. at 70. "Is that what the Court really intended buried in a few sentences of a footnote in one of the longest cases in Supreme Court history?" *Id.* We think not.

Second, footnote 48 simply cited *Cal-Med* together with *Buckley* in the course of establishing the constitutionality of limits on contributions to *political parties*, not to *non-profits* (which the

## III

We now consider whether the 2004 FEC regulations at issue in this case comport with the relevant constitutional principles.  They do not.

The fundamental flaw, as counsel for EMILY's List succinctly stated at oral argument, is that the Commission improperly "brought to bear what was essentially a political party analysis to a non-connected, independent committee which is not under the control of, or associated with

---

Court had no need to address).  In the key concluding sentence in the footnote, the Court rejected the idea that the government could only regulate "*parties* as pass-throughs."  *McConnell*, 540 U.S. at 152 n.48 (emphasis added).  Moreover, footnote 48 was responding to a point in Justice Kennedy's dissent that had nothing to do with non-profits.  *See* Briffault, 73 GEO. WASH. L. REV. at 986 ("importantly, the *McConnell* footnote was written in the course of the Court's analysis of BCRA's application of contribution limits to the activities of political parties").  We would unfairly wrench footnote 48 from its context were we to adopt the broad interpretation some have proposed.

Third, in a later passage in the *McConnell* opinion, the Court explained that, under the statute, "[i]nterest groups . . . remain free to raise soft money to fund voter registration, GOTV activities, mailings," and advertisements.  540 U.S. at 187.  That passage – and the accompanying discussion – would make little sense if footnote 48 were read to equate non-profits with political parties.

Fourth, the Fourth Circuit in *North Carolina Right to Life* refused to adopt this broad reading of footnote 48; it eschewed the dissenting judge's extensive reliance on it.  *See* 525 F.3d at 333-34 (Michael, J., dissenting).

In short, we decline to read this footnote addressing a different issue in *McConnell* to indirectly (i) overrule *Buckley*, (ii) discard Justice Blackmun's opinion in *Cal-Med*, and (iii) equate non-profits with political parties, contrary to other discussion in *McConnell*.

candidates in the fashion of a political party."  Tr. of Oral Arg. at 4.

## A

The rules set forth in §§ 106.6(c), 106.6(f), and 100.57 contain five relevant provisions.  In our judgment, the provisions are not closely drawn to meet an important governmental interest.[14]

---

[14] We need not decide whether the regulations are subject to the strictest scrutiny applicable to spending restrictions or the still "rigorous" but slightly lesser "closely drawn" scrutiny applicable to contribution restrictions.  *See generally Davis v. FEC*, 128 S. Ct. 2759, 2770-72 (2008); *FEC v. Wis. Right to Life, Inc.* (*WRTL*), 551 U.S. 449, 464 (2007); *Buckley v. Valeo*, 424 U.S. 1, 29 (1976).  Under either permutation of this "exacting" scrutiny, *Buckley*, 424 U.S. at 16, the regulations violate the First Amendment.  That said, the allocation and "mere reference" regulations of §§ 106.6(c) and 106.6(f) are best considered spending restrictions under the analysis set forth in *Wisconsin Right to Life*.  551 U.S. at 457, 477 n.9, 478-79; *see also Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 203 (1981) (opinion of Blackmun, J.) (limits on donations to non-profits subject to strict scrutiny).  In *Wisconsin Right to Life*, the Court indicated that forcing an entity to spend out of a segregated fund subject to source and amount limitations, rather than its general treasury, was a spending restriction.  551 U.S. at 477 n.9.  So too here.  Unlike BCRA's rules for political parties, moreover, these regulations do not limit how much someone can contribute to EMILY's List or other covered non-profits.  Rather, these regulations force non-profit entities to pay for a large percentage of their varied political activities out of hard-money accounts subject to source and amount ($5000) limits rather than out of soft-money accounts that may receive unlimited donations.  Through this mechanism, the regulations limit how much non-profits ultimately can spend on advertisements, get-out-the-vote efforts, and voter registration drives.  These regulations therefore "reduce[] the

Under the Supreme Court's precedents, non-profit entities may be required to use their hard-money accounts for their own contributions to candidates and parties and for an appropriately tailored share of administrative expenses associated with such contributions. But as explained above, non-profits may not be forced to use their hard-money accounts for expenditures such as advertisements, get-out-the-vote efforts, and voter registration drives. Non-profits – like individual citizens – are entitled to spend and raise unlimited money for those activities. The FEC's five new regulatory provisions flout those principles.

First, the regulations require covered[15] non-profit entities to use their hard-money accounts to pay at least 50% of the

quantity of expression" for groups like EMILY's List "by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley*, 424 U.S. at 19. As a rough analogy, consider a law that requires home buyers to pay a 50% cash down payment to obtain a mortgage. That kind of law would significantly limit how much buyers could afford to spend for a new house. A similar dynamic is at play as a result of these regulations.

[15] The regulations apply only to those non-profits that must register with the FEC as political committees – namely, groups that receive or spend more than $1000 annually for the purpose of influencing a federal election and whose "major purpose" involves federal elections. *Buckley*, 424 U.S. at 79; *see* 2 U.S.C. §§ 431-434, 441a; *supra* note 7. Our constitutional analysis of donations and spending limits applies both to non-connected non-profits registered as political committees with the FEC and to non-connected non-profits that are not so registered. The fact that a non-profit spends a certain amount or percentage of its money in relation to federal elections cannot be a basis, at least under the anti-corruption rationale, for restricting its ability to accept large donations to support those expenditures. That conclusion follows

costs of their generic get-out-the-vote efforts and voter registration activities. 11 C.F.R. § 106.6(c). By "generic," the regulations mean those activities that refer to a party but do not promote or oppose a particular candidate. *See id.* § 100.25. This provision violates the First Amendment because non-profits are constitutionally entitled to pay 100% of the costs of such voter drive activities out of their soft-money accounts. *See Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 203 (1981) (opinion of Blackmun, J.); *see also FEC v. Mass. Citizens for Life, Inc.* (*MCFL*), 479 U.S. 238, 259-63 (1986); *FEC v. Nat'l Conservative PAC* (*NCPAC*), 470 U.S. 480, 501 (1985); *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 298-99 (1981); *Buckley v. Valeo*, 424 U.S. 1, 45-48 (1976).

Second, the regulations mandate that covered non-profits use their hard-money accounts for 50% of any generic communications that refer to a party without referring to a candidate, for example, "Support the Democratic party." 11 C.F.R. § 106.6(c). This provision likewise violates the First Amendment because non-profits are constitutionally entitled to pay 100% of the costs of such communications out of their soft-money accounts. *See Cal-Med*, 453 U.S. at 203 (opinion of Blackmun, J.); *see also MCFL*, 479 U.S. at 259-63; *NCPAC*, 470 U.S. at 501; *Citizens Against Rent Control*, 454 U.S. at 298-99; *Buckley*, 424 U.S. at 45-48.

---

from the Supreme Court's consistent holdings that large expenditures are constitutionally protected and the corresponding principle that non-profits are constitutionally entitled to accept large donations to their soft-money accounts to support advertisements, get-out-the-vote efforts, and voter registration activities. Of course, because of the lesser First Amendment protection against disclosure, the major purpose test is permissible under current precedent for determining non-profits' disclosure obligations. *See Buckley*, 424 U.S. at 79.

Third, the regulations direct covered non-profit entities to use their hard-money accounts to pay at least 50% of all administrative expenses. 11 C.F.R. § 106.6(c). Those administrative expenses include rent, utilities, office supplies, and salaries, among other costs. But a non-profit may be forced to use hard money for, at most, a percentage of administrative expenses that "closely" corresponds to the percentage of activities relating to its contributions as compared to its advertisements, get-out-the-vote efforts, and voter registration activities. *See Davis v. FEC*, 128 S. Ct. 2759, 2770 (2008) (campaign finance regulations must at least be "closely drawn" to further an important governmental interest); *Cal-Med*, 453 U.S. at 198-99 n.19 (opinion of Marshall, J.) (rejecting argument that non-profit was entitled to pay its "*entire*" administrative expenses with unlimited donations or soft-money account) (emphasis added). The tailoring must ensure that a hybrid non-profit is not unduly advantaged as compared to a non-profit that makes only contributions (and thus must fund certain administrative expenses with hard money) and is not unduly disadvantaged as compared to a non-profit that makes only expenditures (and thus may fund its administrative expenses with soft money). Section 106.6(c) does not attempt or purport to allocate administrative expenses in that way. And the "desire for a bright-line rule . . . hardly constitutes the *compelling* state interest necessary to justify any infringement on First Amendment freedom." *FEC v. Wis. Right to Life, Inc.* (*WRTL*), 551 U.S. 449, 479 (2007) (internal quotation marks omitted) (controlling opinion of Roberts, C.J.).

Fourth, the regulations compel covered non-profit entities to use their hard-money accounts to pay 100% of the costs of advertisements or other communications that "refer" to a federal candidate. 11 C.F.R. § 106.6(f)(1). If an

advertisement or communication refers to a state candidate as well as a federal candidate, the non-profit must pay for it with a percentage of its hard-money account as determined by time and space allocation. *See id.* § 106.6(f)(3). Here again, the problem is that non-profits are constitutionally entitled to pay 100% of the costs of their advertisements and other communications out of a soft-money account. *See MCFL*, 479 U.S. at 251; *NCPAC*, 470 U.S. at 501; *Citizens Against Rent Control*, 454 U.S. at 299; *Cal-Med*, 453 U.S. at 203 (opinion of Blackmun, J.); *Buckley*, 424 U.S. at 45-48.

Fifth, the regulations create a new regime for solicitations indicating that donated funds will be used to support or oppose the election of a clearly identified federal candidate. 11 C.F.R. § 100.57. The regulations require that donations in response to such solicitations be treated as 100% hard money. *Id.* § 100.57(a)-(b)(1). This means that donations in response to such solicitations are subject to a $5000 cap. If a solicitation also refers to a state or local candidate, at least 50% of the responsive donations must go to the hard-money account. *Id.* § 100.57(b)(2). This provision is badly flawed. Non-profits are entitled to raise money for their soft-money accounts to help support their preferred candidates, yet this regulation prohibits non-profits from saying as much in their solicitations. "Such notions run afoul of the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *WRTL*, 551 U.S. at 477 n.9 (internal quotation marks omitted); *Davis*, 128 S. Ct. at 2771 (provision that requires choice between "unfettered political speech" and "discriminatory fundraising limitations" violates First Amendment).

B

In short, the new FEC regulations do not pass muster under the Supreme Court's First Amendment precedents. The regulations are not "closely drawn" to serve a cognizable anti-corruption interest. *See Davis*, 128 S. Ct. at 2770-71; *WRTL*, 551 U.S. at 478-80; *NCPAC*, 470 U.S. at 496-97; *Citizens Against Rent Control*, 454 U.S. at 296-97; *Buckley*, 424 U.S. at 26-27, 45-48. Donations to and spending by a *non-profit* cannot corrupt a candidate or officeholder, at least in the absence of some *McConnell*-like evidence establishing such corruption or the appearance thereof. *See N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 292-93 (4th Cir. 2008); *see also* Richard Briffault, *The 527 Problem and the* Buckley *Problem*, 73 GEO. WASH. L. REV. 949, 999 (2005) ("The 527s do not fit easily within *Buckley*'s anticorruption paradigm, at least as the Supreme Court has defined corruption until now."); Gregg D. Polsky & Guy-Uriel E. Charles, *Regulating Section 527 Organizations*, 73 GEO. WASH. L. REV. 1000, 1027-35 (2005).

Of course, the fact that the regulations do not serve a cognizable anti-corruption interest is not surprising because the decision to more tightly regulate entities like EMILY's List arose out of an entirely different concern: the influence of non-profits that raise and spend large amounts of money and thereby affect federal elections. *See, e.g.*, Comments of Democracy 21, Campaign Legal Center & Center for Responsive Politics in Response to Notice of Proposed Rulemaking, No. 2004-6, at 1-2 (Apr. 5, 2004) (criticizing "the spending of tens of millions of dollars of soft money explicitly for the purpose of influencing the presidential election by section 527 groups"). Responding to such complaints, the FEC adopted these new regulations to tamp down spending by non-profits and thereby better equalize the

voices of citizens and groups who participate in the political process. Large donations to and spending by non-profits prompted these regulations, and limiting non-profits' expenditures is their intended and predictable effect.

But the Supreme Court's First Amendment cases have repeatedly repudiated this equalization rationale as a basis for regulating campaign-related contributions or expenditures. *See Davis*, 128 S. Ct. at 2773; *Buckley*, 424 U.S. at 48-49. Under current law, therefore, these regulations are unsupportable. The concern with "large individual donations to the 527s is that they permit a tiny group of Americans – the wealthiest . . . – to play an enormous role in the electoral process . . . . *Buckley*, however, rejected the protection of political equality as a basis for limiting the role of money in election campaigns." Briffault, 73 GEO. WASH. L. REV. at 954 (internal quotation marks omitted).

As a lower court, we must strictly adhere to the Supreme Court's precedents. The regulations contravene the First Amendment as it has been interpreted thus far by the Supreme Court.[16]

C

As some commentators point out, it might seem incongruous to permit non-profits to receive and spend large soft-money donations when political parties and candidates cannot. *See* Samuel Issacharoff & Pamela S. Karlan, *The Hydraulics of Campaign Finance Reform*, 77 TEX. L. REV.

---

[16] This case does not involve reporting and disclosure obligations. The Government has a freer hand in imposing reporting and disclosure requirements than it does in limiting contributions and expenditures. *See McConnell v. FEC*, 540 U.S. 93, 121-22 (2003); *Buckley*, 424 U.S. at 64-68.

1705, 1715 (1999). But this perceived anomaly has existed to some extent since *Buckley*, which recognized that contribution limitations "alone would not reduce the greater potential voice of affluent persons and well-financed groups, who would remain free to spend unlimited sums directly to promote candidates and policies they favor in an effort to persuade voters." *Buckley*, 424 U.S. at 26 n.26. And *McConnell* similarly took note of the fact that, even after that decision upholding regulations on contributions to parties, "[i]nterest groups . . . remain free to raise soft money to fund voter registration, GOTV activities, mailings," and advertisements. *McConnell v. FEC*, 540 U.S. 93, 187 (2003).

If eliminating this perceived asymmetry is deemed necessary, the constitutionally permitted legislative solution, as the Court stated in an analogous situation in *Davis*, is "to raise or eliminate" limits on contributions to parties or candidates. 128 S. Ct. at 2774. But it is not permissible, at least under current Supreme Court precedents, to remove the incongruity by placing these limits on spending by or donations to non-profits.

IV

In addition to its First Amendment challenge to the five regulatory provisions, EMILY's List alternatively contends that three of the five provisions exceed the FEC's statutory authority. *See* 5 U.S.C. § 706(2)(C) (agency may not act "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."). We agree.

When enacting BCRA in 2002, Congress did not authorize the FEC to restrict donations to or spending by non-profits – even though Congress was aware that BCRA's restrictions on political parties meant that independent non-

profit groups would become more influential in the electoral process. Indeed, Senator Lieberman, speaking in the Senate at the time, anticipated that "at least some of the soft money donors who will no longer be able to give to political parties will be looking for other ways to influence our elections. Donations to 527 groups will probably top many of their lists." 148 CONG. REC. S10779 (daily ed. Oct. 17, 2002) (statement of Sen. Lieberman). He was right. Yet in the seven years since BCRA was enacted, Congress still has not imposed limits on non-profits, apparently because of continuing constitutional and policy concerns about regulating them in such a manner.

The statutory question, therefore, is whether the FEC's authority under the long-standing Federal Election Campaign Act justifies the challenged regulations.

Under FECA, the FEC's authority extends only to regulating donations and expenditures made "for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i). As the Supreme Court has explained, "[d]onations made solely for the purpose of influencing state or local elections are therefore unaffected by FECA's requirements and prohibitions." *McConnell v. FEC*, 540 U.S. 93, 122 (2003).

Under FECA, in other words, the FEC possesses statutory authority to require a non-profit to use its hard-money account to pay for federal activities, generic activities, and mixed federal-state-local activities. *See id*. at 122-23.[17]

---

[17] As explained earlier in this opinion, those approaches run into severe First Amendment obstacles. For purposes of this discussion, however, we analyze the statute as written without regard to constitutional implications.

But the FEC exceeds its statutory authority when it requires non-profits to use hard money for *exclusively* state and local election activities. *See id.* at 122; *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984) (step one).

The three regulatory provisions that EMILY's List challenges under FECA cross the statute's boundaries.

EMILY's List targets one of the provisions in § 106.6(c) as exceeding the FEC's statutory authority – namely, the part requiring covered non-profits to use their hard-money accounts to pay for 50% of their administrative expenses. This requirement applies even if more than 50% of a non-profit's administrative expenses are *exclusively* associated with state and local elections. That poses a problem because the FEC possesses no authority under FECA to require non-profits to use their hard-money accounts for their exclusively state and local election activities. We thus concur with EMILY's List that this provision is overbroad and "federalizes the funding and reporting of a large portion of such a committee's nonfederal receipts and disbursements, which are not made for the purpose of influencing federal elections." EMILY's List Br. at 39.[18]

---

[18] As discussed above, § 106.6(c) also requires non-profits to use their federal or hard-money accounts to pay for (i) at least 50% of their generic get-out-the vote and voter registration activities and (ii) at least 50% of their generic communications, which refer to a party but not a candidate. In its brief, EMILY's List does not raise statutory challenges to those two provisions. *See* EMILY's List Br. at 35-40; *id.* at 38 (challenging under the statute only that provision in § 106.6(c) that sets forth a "'Minimum Percentages' Rule for Administrative Costs"). Presumably, EMILY's List has not challenged these two provisions under FECA because *McConnell* indicated that these generic activities qualify under the statute as

Next, EMILY's List argues that § 106.6(f) exceeds the FEC's statutory authority. Recall that this provision requires covered non-profits to use hard money for all or part of their public communications that merely "refer" to federal candidates. *See* 11 C.F.R. 106.6(f). The FEC runs roughshod over the limits on its statutory authority when it presumes that any public communications that merely "refer" to a federal candidate necessarily seek to influence a *federal* election.[19]

For example, § 106.6(f) would compel a covered non-profit to use some hard money to pay for an advertisement running only in California in which Senator Jones from Maine endorses Candidate Smith for Governor of California. The sole purpose of such an advertisement is to influence the state election in California – a matter entirely outside the FEC's statutory authority.

---

activities and communications "for the purpose of influencing" federal elections. *See McConnell*, 540 U.S. at 123 ("Although *a literal reading of FECA's definition of 'contribution' would have required such activities to be funded with hard money*, the FEC ruled that political parties could fund mixed-purpose activities – including get-out-the-vote drives and generic party advertising – in part with soft money.") (emphasis added).

[19] The original FEC proposal was far narrower and would have covered only communications that promote, attack, support, or oppose federal candidates, similar to BCRA's requirement for state and local parties. *See* 69 Fed. Reg. at 11,753, 11,757-11,758 (Mar. 11, 2004) (notice of proposed rulemaking). After initially considering that limited proposal, the FEC ultimately decided to regulate broadly and to saddle non-profits with even greater restrictions than Congress in BCRA chose to impose on state and local parties.

An incident illustrating § 106.6(f)'s statutory flaws occurred in 2005. EMILY's List sought to run advertisements featuring Senator Stabenow in order to support Democratic women candidates for state legislative offices. At the time, Senator Stabenow was a candidate for reelection to the U.S. Senate in Michigan. EMILY's List represented that the communication would not be distributed in Michigan, would not reference Senator Stabenow's federal candidacy, would not solicit funds for her federal candidacy, and would not refer to any clearly identified non-federal candidate. Rather, it would support non-federal Democratic women candidates as a class. Nonetheless, the FEC determined that the mere reference to Senator Stabenow meant that EMILY's List had to pay for the communications with 100% hard money. *See* FEC Adv. Op. 2005-13, at 3-4 (Oct. 20, 2005).

Finally, EMILY's List argues that the solicitation rule set forth in § 100.57 also exceeds the FEC's statutory power. We agree. To reiterate, § 100.57 requires covered non-profits to treat as hard-money "contributions" *all* funds given in response to solicitations indicating that "*any* portion" of the funds received will be used to support or oppose the election of a federal candidate. 11 C.F.R. §§ 100.57(a)-(b)(1) (emphasis added). If the communication indicates that the funds will support or oppose both a federal and non-federal candidate, then at least 50% of those funds must be treated as hard money. *See id.* § 100.57(b)(2). The statutory defect in the rule is that, depending on the particular solicitation at issue, it requires covered non-profits to treat as hard money certain donations that are not actually made "for the purpose of influencing" federal elections.

Consider a fundraising pitch in which a non-profit such as EMILY's List tells donors that only 10% of their gift will be used to support identified federal candidates, with the rest

to *exclusively* support state and local candidates. Each donor fully and correctly understands that only a small portion of his or her gift will be used "for the purpose of influencing" federal elections. And yet, § 100.57 requires that at least 50% of donations in response to such a solicitation be classified as a hard-money donation subject to the $5000 cap – thereby simultaneously creating a separate $5000 cap on soft-money donations given in response to such a solicitation. This may require a non-profit to decline or return funds it receives for purely state and local elections. That is not permissible under FECA.

In short, there is a significant mismatch between these challenged provisions and the FEC's authority under FECA. Therefore, we conclude that §§ 106.6(f) and 100.57, as well as the provision in § 106.6(c) that applies to administrative expenses, exceed the FEC's statutory authority.[20]

---

[20] EMILY's List separately argues that three of the five regulatory provisions at issue in this case are also arbitrary and capricious under the Administrative Procedure Act. EMILY's List Br. at 40-44. We are less persuaded by EMILY's List's free-standing arbitrary and capricious argument. Putting aside the constitutional and statutory-authority problems with the challenged rules, the provisions are not otherwise arbitrary and capricious. Agencies generally do not violate the APA's deferential arbitrary-and-capricious standard when they employ bright-line rules for reasons of administrative convenience, so long as those rules fall within a zone of reasonableness and are reasonably explained. *See, e.g.*, *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1084 (D.C. Cir. 2002); *WorldCom, Inc. v. FCC*, 238 F.3d 449, 461-62 (D.C. Cir. 2001).

EMILY's List does not bring a challenge under either FECA or the APA to § 106.6(c)'s requirement that covered non-profits pay at least 50% of the cost of their generic communications out of their hard-money accounts. *See* EMILY's List Br. at 35-44.

V

Before concluding, we add a few words regarding the concurring opinion.

To begin, it is important to emphasize the area of agreement between the opinion of the Court and the concurrence. All three judges on the panel have determined that §§ 106.6(c), 106.6(f), and 100.57 are unlawful and must be vacated.

The concurrence advances two main points: (i) that under *McConnell*, the Federal Government constitutionally may regulate non-profits like political parties; and (ii) that we should not address the First Amendment issue in this case. Neither argument is convincing.

*First*, the concurrence contends that "regulation of political parties is not *McConnell*'s theme," and it reads *McConnell* to support regulation not only of political parties but also of independent non-profit groups. Concurring Op. at 19. As we have explained at length above, we do not find that a persuasive interpretation of *McConnell*. In upholding Title I of BCRA, the *McConnell* Court relied heavily on the "unity of interest," "close relationship," and "close ties" among candidates, officeholders, and political parties. The concurrence identifies no similar unity of interest between non-profits, on the one hand, and candidates, officeholders, or parties on the other. The *McConnell* Court also based its decision on the substantial record evidence of parties selling access in exchange for soft-money contributions. The Court repeatedly emphasized that "Congress must show concrete

---

EMILY's List raises only a constitutional challenge to that provision.

evidence that a particular type of financial transaction is corrupting or gives rise to the appearance of corruption . . . . It has done so here." *McConnell*, 540 U.S. at 185-86 n.72. The concurrence cites no similar record evidence showing that non-profits sell access to officeholders and candidates in exchange for large soft-money contributions.

In our judgment, "*McConnell* views political parties as different in kind than independent expenditure committees." *N.C. Right to Life v. Leake*, 525 F.3d 274, 293 (4th Cir. 2008). We therefore disagree with the concurrence's attempt to stretch *McConnell*'s reasoning from political parties to non-profits.[21]

---

[21] The concurrence notes that *McConnell* upheld § 323(f) of BCRA, which prohibits state and local candidates and officeholders from using soft money for communications that promote, support, attack, or oppose a federal candidate. We fail to see how this aspect of *McConnell* justifies upholding limits on *non-profits*. *McConnell*, as we read it, relied in part on the fact that officeholders, candidates, and parties at all levels share a close relationship and apparent unity of interest. And the Court also based its conclusion with respect to state and local candidates and officeholders – as elsewhere – on "the record in this litigation," 540 U.S. at 185, emphasizing that "Congress must show concrete evidence that a particular type of financial transaction is corrupting or gives rise to the appearance of corruption . . . . It has done so here." *Id.* at 185-86 n.72.

The concurrence also raises concern about the activities of non-profit committees that are "closely aligned" with federal candidates. Concurring Op. at 23. But our constitutional analysis of non-profits applies only to *non-connected* non-profits. *See* 11 C.F.R. § 106.6(a); *supra* note 7. Moreover, expenditures by individuals or non-profits that are coordinated with a candidate may be considered contributions to that candidate.

Relatedly, the concurrence disputes our reading of *Cal-Med*. *See* Concurring Op. at 24. But our analysis of that case, including our reliance on Justice Blackmun's opinion, tracks the persuasive reasoning of the Fourth Circuit in *North Carolina Right to Life*, of several other courts, and of numerous commentators. *See, e.g.*, *N.C. Right to Life*, 525 F.3d at 292; *see also, e.g.*, *Comm. on Jobs Candidate Advocacy Fund v. Herrera*, No. C 07-03199, 2007 WL 2790351, *4 (N.D. Cal. Sept. 20, 2007); *Wash. State Republican Party v. Wash. State Pub. Disclosure Comm'n*, 4 P.3d 808, 825 (Wash. 2000); Richard Briffault, *The 527 Problem and the* Buckley *Problem*, 73 GEO. WASH. L. REV. 949, 982-85 (2005); John C. Eastman, *Strictly Scrutinizing Campaign Finance Restrictions (and the Courts that Judge Them)*, 50 CATH. U. L. REV. 13, 37 (2000); Gregg D. Polsky & Guy-Uriel E. Charles, *Regulating Section 527 Organizations*, 73 GEO. WASH. L. REV. 1000, 1031 (2005). Moreover, the concurrence does not substantively address the several post-*Cal-Med* cases that similarly recognize the right of non-profits to raise and spend money to support their agendas and preferred candidates. *See, e.g.*, *FEC v. Mass. Citizens for Life, Inc.* (*MCFL*), 479 U.S. 238, 259-65 (1986); *FEC v. Nat'l Conservative PAC* (*NCPAC*), 470 U.S. 480, 501 (1985); *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 296-99 (1981).

The concurrence further contends that we have not received on-point briefing on the constitutional issue. We again respectfully disagree. The briefs and oral argument focused first and most extensively on the First Amendment and *McConnell* – and debated the key question in this case: For First Amendment purposes, are non-profits more like individual citizens (who under *Buckley* have the right to spend unlimited money to support their preferred candidates) or more like political parties (which under *McConnell* do not)?

*See Buckley v. Valeo*, 424 U.S. 1, 44-51 (1976); *see also McConnell*, 540 U.S. at 155-56.  Moreover, *Cal-Med* was cited and discussed often in the briefs and at oral argument. *See* Tr. of Oral Arg. 17-18, 32-33; FEC Br. at 21, 27, 28, 34; Amicus Br. at 21, 24; EMILY's List Reply Br. at 11, 19-20. Indeed, the FEC's brief noted that *Cal-Med* was a case "chiefly relied upon."  FEC Br. at iv.  In short, the briefs and oral argument focused on and grappled with the critical issues posed by the First Amendment challenge.

The concurrence suggests, however, that our holding goes further than the submission of EMILY's List.  But EMILY's List forcefully argued that these regulations "violate the First Amendment of the United States Constitution," contended that *McConnell* and *Cal-Med* do not support the FEC's approach, and asked the Court to vacate the new regulations in their entirety.  EMILY's List Br. at 19.  In deciding this case, we have set forth the relevant constitutional principles as we discern them, and we then have applied those principles to the challenged regulations.  In so doing, we have concluded that the regulations violate the First Amendment; we therefore have vacated the regulations, which is precisely the relief EMILY's List sought in advancing its First Amendment claims.

*Second*, apart from its substantive disagreement with our First Amendment analysis, the concurrence states that we should resolve this case on statutory grounds alone, and claims that it is "gratuitous" for us to address the First Amendment.  We respectfully but firmly disagree.

The threshold problem with the concurrence's preferred statutory-only approach is that EMILY's List raises a statutory challenge to only three of the five provisions at issue here.  EMILY's List does not advance a statutory challenge to

the provision in § 106.6(c) requiring that covered non-profits use their federal or hard-money accounts to pay for at least 50% of their generic get-out-the-vote and voter registration activities. Nor does EMILY's List raise a statutory challenge to the provision in § 106.6(c) requiring that covered non-profits use hard money to pay for at least 50% of their generic communications. *Compare* EMILY's List Br. at 38-39 (discussing only administrative expenses provision of § 106.6(c) in statutory section of brief) *with* EMILY's List Br. at 32 (raising constitutional challenges to all provisions of § 106.6(c)). Indeed, footnote 11 of EMILY's List's brief all but concedes that, under the statute, the FEC may require use of hard money for these generic activities.

EMILY's List's decision not to target these two provisions of § 106.6(c) on statutory grounds appears wise. Such an argument would be very difficult to square with *McConnell*'s several pointed statements that FECA permits the FEC to treat generic activities as entirely federal for purposes of contribution and expenditure limits. In fact, *McConnell* harshly criticized the FEC for not having previously treated political parties' generic activities as entirely federal activities subject to FECA's limits. *See McConnell*, 540 U.S. at 142 (by allowing generic activities to be funded largely with soft money, FEC's allocation regime "subverted" original FECA scheme); *id.* at 167 (FECA scheme "eroded" by FEC's allocation regime); *see also id.* at 142 n.44.[22]

---

[22] The concurrence finds "perplexing[]" our reading of *McConnell*'s statutory discussion. Concurring Op. at 10. We think it's straightforward. *McConnell* said the statutory phrase "for the purpose of influencing" federal elections covers generic activities. *McConnell*, 540 U.S. at 167. That seems to foreclose any *statutory* challenge to the new regulatory provisions applicable to generic

Under the circumstances, we have no choice but to address EMILY's List's First Amendment argument. The concurrence apparently wants us to address a statutory argument that EMILY's List did not raise and then to accept that statutory claim even though we find it unpersuasive and inconsistent with precedent. We respectfully decline the concurrence's proposal.[23]

---

activities. But that of course does not resolve EMILY's List's *constitutional* challenge.

[23] Even if EMILY's List had put forward meritorious statutory challenges to all of the regulatory provisions that it has challenged under the First Amendment, we still would possess discretion to rule in the alternative on both statutory and constitutional grounds. The avoidance principle cited by the concurrence is prudential, not jurisdictional. And it is not uncommon for lower courts to rule on alternative statutory and constitutional grounds when appropriate. *See, e.g., United States v. Thomas*, No. 07-3080, 2009 WL 2152429, *3-5 (D.C. Cir. July 21, 2009); *Time Warner Entm't Co., L.P. v. FCC*, 240 F.3d 1126, 1128 (D.C. Cir. 2001); *see generally* Richard H. Fallon, Jr. & Daniel J. Meltzer, *New Law, Non-Retroactivity, and Constitutional Remedies*, 104 HARV. L. REV. 1731, 1801 (1991) ("Simply as a routine matter, the Supreme Court, in common with the lower federal courts, may choose to discuss either or both of alternative grounds for reaching a decision.").

Given that the complaint in this case was filed four and a half years ago, that the parties and the District Court overwhelmingly focused their attention on the constitutional issue, that resolution of the case only on statutory grounds would not alleviate the continuing legal uncertainty, and that this is an area of law demanding prompt and clear judicial decisionmaking, it would not be an inappropriate exercise of judicial discretion for an intermediate court to resolve this case on alternative constitutional and statutory grounds.

\* \* \*

The FEC rules challenged by EMILY's List –
§§ 106.6(c), 106.6(f), and 100.57 – violate the First
Amendment.  Sections 106.6(f) and 100.57 also exceed the
FEC's authority under the Federal Election Campaign Act, as
does the provision of § 106.6(c) that applies to administrative
expenses.  The FEC may not enforce §§ 106.6(c), 106.6(f), or
100.57.  We reverse the judgment of the District Court and
direct it to enter judgment for EMILY's List and to vacate the
challenged regulations.

*So ordered.*

---

In any event, we need not cross that discretionary bridge here
because, as we have explained, we must address the Constitution's
application to non-profits' election-related spending and
fundraising in order to resolve the appeal.

BROWN, *Circuit Judge*, concurring in part: "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944). "Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). Because these regulations must be vacated as contrary to the statute, we need not and should not reach the First Amendment issue. But if we're going to answer an unnecessary constitutional question, we at least ought to get it right. In light of *McConnell v. FEC*, 540 U.S. 93 (2003), I have grave doubts about the court's analysis, which bears at most a passing resemblance to the parties' briefs, and which will profoundly affect campaign finance law in this circuit. I thus respectfully concur only with Part IV of the court's opinion, except for footnotes 17, 18 and 20.

## I.

## A.

Though I do not join their First Amendment holding, I agree with my colleagues' conclusion that we must vacate the regulations challenged here (the *Multiple Candidate Allocation Regulation*, 11 C.F.R. § 106.6(f); the *Solicitation Regulation*, 11 C.F.R. § 100.57; and the *Administrative Costs Allocation Regulation*, 11 C.F.R. § 106.6(c)). I begin with first principles. The Federal Election Commission (FEC) is an agency within the Executive Branch. The Executive Branch cannot make law, but instead executes laws enacted by the Legislative Branch. In executing the law, the FEC may issue "necessary" rules, 2 U.S.C. § 437d(a)(8), but, as with all agencies, the FEC acts contrary to law if it promulgates

regulations "in excess of [its] statutory jurisdiction," 5 U.S.C. § 706(2)(C). *See also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

By the plain language of the Federal Election Campaign Act (FECA), the FEC lacks the power it now asserts. To fall within FEC jurisdiction, a "gift, subscription, loan, advance, or deposit of money or anything of value" must be provided to a political committee "for the purpose of influencing any election for Federal office," 2 U.S.C. § 431(8)(A)(i), and any money expended by such a committee must also have been done for that same purpose, *id.* § 431(9)(A)(i). There is no other reasonable way to read Congress's words. For the FEC to have any role, money must be used for the "purpose"— defined as an "objective, goal, or end," BLACK'S LAW DICTIONARY 1356 (9th ed. 2009)—of "influencing" an "election for Federal office." The inescapable corollary is the FEC has no authority over money given or spent "solely for the purpose of influencing state or local elections," an activity "unaffected by FECA's requirements and prohibitions." *McConnell*, 540 U.S. at 122.

Here, the FEC has set aside Congress's command that the agency's jurisdiction be bounded by the "purpose" for which money is spent. Instead of strictly minding this jurisdictional marker, the FEC conclusively presumes a federal purpose drives any spending that might influence a federal election.[1] The question though is not whether spending influences a federal election, but whether it was spent for that reason.

---

[1] *See, e.g.*, Political Committee Status, Definition of Contribution, and Allocation for Separate Segregated Funds and Nonconnected Committees, 69 Fed. Reg. 68,056, 68,062 (Nov. 23, 2004) (Final Rules) ("[R]eferences solely to a political party inherently influence both Federal and non-Federal elections.").

Otherwise, the word "purpose" becomes superfluous, a result that this court cannot accept, *e.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979), especially for a jurisdictional provision like this one, *see, e.g.*, *N. Am. Van Lines, Inc. v. NLRB,* 869 F.2d 596, 598 (D.C. Cir. 1989). Under FECA, federal effects are simply not enough.[2]

Nor does labeling spending that may affect both state and federal elections as "mixed-purpose" somehow solve the FEC's problem. Regulating on the basis of such a label still assumes there must be a federal purpose behind any spending that might influence, even tangentially, a federal campaign. Because that necessary assumption is false, these regulations remain invalid. Only *after* a federal purpose—mixed or otherwise—is identified does the FEC's power come into play. If a federal purpose can be shown, then allocation ratios like those promulgated here may well be appropriate under FECA, but just asserting that there must be a federal purpose skips the threshold jurisdictional question.[3]

---

[2] *Cf.* 42 U.S.C. § 1973c (under the Voting Rights Act, certain jurisdictions cannot alter their voting procedures without showing the change "neither has the *purpose* nor will have the *effect* of denying or abridging the right to vote on account of race or color" (emphasis added)).

[3] It is also no defense to say that under *Buckley v. Valeo*, 424 U.S. 1 (1976), *everything* political committees do reflects federal purposes. *See EMILY's List v. FEC*, 569 F. Supp. 2d 18, 44 (D.D.C. 2008) ("EMILY's List is undoubtedly correct that its status as a political committee does not automatically give the FEC authority to regulate its legitimately nonfederal election activities."). In *Buckley*, the Court explained "[e]xpenditures of . . . 'political committees' . . . can be assumed to fall within the core area sought to be addressed by Congress." 424 U.S. at 79. This "assum[ption]," however, is rebutted when it is unreasonable to posit a federal purpose. *See Akins v. FEC*, 101 F.3d 731, 742 (D.C.

4

B.

These regulations give short shrift to the "purpose" of spending and so must be vacated. Indeed, we have already rejected the FEC's view. Just fours years ago, in *Shays v. FEC*, we held FECA requires that "to qualify as 'expenditure' in the first place, spending must be undertaken 'for the purpose of influencing' a federal election" and agreed with the FEC that "time, place, and content may be critical indicia of communicative purpose." 414 F.3d 76, 99 (D.C. Cir. 2005). Though a federal

> election-related intent is obvious . . . in statements urging voters to "elect" or "defeat" a specified candidate or party, the same may not be true of ads identifying a federal politician but focusing on pending legislation—a proposed budget, for example, or government reform initiatives—and appearing three years before the next election. Nor is such purpose necessarily evident in statements referring, say, to a Connecticut senator but running only in San Francisco media markets.

*Id.*

*Shays* confirms what FECA says: context matters. Referencing a federal candidate "may" reveal a federal purpose, but if an ad will not be aired to her constituents or if it will run "years before the next election," then absent some persuasive indicia of a federal purpose, a reference by itself to

---

Cir. 1996) (en banc) *vac'd on other grounds* 524 U.S. 1 (1998) (*Buckley* only "creat[es] a presumption" of a federal purpose).

the candidate does not trigger FEC jurisdiction. This was the FEC's position in *Shays*, and it should be the FEC's position now. FECA's unambiguous text requires no less.

Under the *Multiple Candidate Allocation Regulation*, political committees must use hard money for "[p]ublic communications that refer to one or more clearly identified Federal candidates, regardless of whether there is reference to a political party, but do not refer to any clearly identified non-Federal candidates." 11 C.F.R. § 106.6(f)(1). The rule is categorical. Even if a communication only says "Vote No on State Ballot Initiative 123—They Waste Enough Taxes in Washington, D.C.," merely referring (perhaps by means of a montage of grainy black-and-white photos) to United States Senators of both parties with a penchant for pork-barrel spending, the ad is *per se* deemed to have a federal purpose. This is true even if those big spenders hail from distant states, are not up for reelection for years, and the spot will not be shown anywhere near their voters. Whether such an ad could affect a federal race is doubtful, but the FEC goes further and says these ads *always* reflect a federal purpose. In an age when even pizza shops and used-car dealers invoke the stereotype of wasteful federal spending to sell their wares, the FEC's lack of sophistication is startling.

The FEC's approach also ignores that a state campaign may be more effective if the campaigning group can mention a federal official's endorsement. Many federal politicians are of national stature, particularly those associated with hot button political issues. If, for example, a referendum would make it more difficult to get an abortion, a pro-choice group may trumpet a statement denouncing it from a prominent pro-choice United States senator, while a pro-life group may respond with a statement from an equally prominent pro-life senator. To say, as the FEC does, that citing these statements

can *only* be done for the purpose of influencing federal elections is to pretend away the power of celebrity. Just as Michael J. Fox's name might be used in commercials for a stem cell amendment because his association makes for effective politics, *see* Alfonso Serrano, *Stem Cell Opponents To Air Celebrity Ad*, CBSNEWS.COM, Oct. 25, 2006, http://www.cbsnews.com/stories/2006/10/25/politics/main212 2383.shtml, an out-of-state and out-of-cycle Senator Debbie Stabenow's endorsement might be used to support state candidates because her association makes for effective state politics, particularly to targeted demographics.[4]

The *Solicitation Regulation* respects Congress's language no better. The regulation declares any donation "made by any person in response to any communication is a contribution to the person making the communication if the communication indicates that any portion of the funds received will be used to support or oppose the election of a clearly identified Federal candidate." 11 C.F.R. § 100.57(a). This rule applies even if a solicitation's banner headline says only a certain percentage of the donation will be used for federal activities. Hence, even if someone gives $1000 in response to a solicitation that unambiguously says 90% of what is received will be spent on local elections, the FEC asserts jurisdiction over the entire gift. If a gift is made subject to this disclaimer, how is the full $1000 given for the purpose of influencing a federal election?

The *Solicitation Regulation* also says "[i]f the solicitation does not refer to any clearly identified non-Federal

---

[4] "[R]eferring to Senator Stabenow might well inspire recipients outside of her home state to contribute to her campaign, and thus influence her federal election, or might otherwise raise her national profile and ultimately influence her election," *EMILY's List*, 569 F. Supp. 2d. at 48, but if such speculative brainstorming can satisfy FECA's "purpose" requirement, there is no "purpose" requirement.

candidates, but does refer to a political party, in addition to [a] clearly identified Federal candidate," then the entire gift becomes subject to the FEC's authority, *id.* § 100.57(b)(1), and "[i]f the solicitation refers to one or more clearly identified non-Federal candidates, in addition to [a] clearly identified Federal candidate . . . , at least fifty percent (50%) of the total funds received are contributions [subject to the FEC], whether or not the solicitation refers to a political party," *id*. § 100.57(b)(2). Even if the solicitation is unmistakable that the entire gift will be spent on local elections, the FEC nonetheless still claims jurisdiction over at least some of the resulting donations.

This blindingly-bright line suffers from the same flaw as the *Multiple Candidate Allocation Regulation*: it assumes merely referencing a federal candidate always unmasks a purpose of influencing a federal election and assumes those who give money in response to such a solicitation also unfailingly do so for the same purpose. That's just not true. Instead, a federal politician's name can be used for reasons tied solely to state electioneering. Again, consider an out-of-state and out-of-cycle Senator Stabenow. If she were to say "EMILY's List supported a Democrat like me when I was running for state office, and I'm asking you to support EMILY's List now so it can continue to work on behalf of women who are seeking state office," then under the *Solicitation Regulation*, the entire amount of any donations is subject to the FEC.[5] That result conflicts with Congress's "purpose" requirement.

---

[5] My hypothetical is similar to one EMILY's List posed to the FEC, with the only material difference being the inclusion of a party label. While the FEC said EMILY's List's solicitation was fine, s*ee* FEC Advisory Op. 2005-13, at 5–6 (Oct. 20, 2005), it could not have said the same for mine: including "Democrat"—an important label in state politics too—causes the gift to be hard money.

Finally, the *Administrative Costs Allocation Regulation* is contrary to law. Under 11 C.F.R. § 106.6(c), committees must use "at least 50 percent Federal funds" for "administrative expenses, costs of generic voter drives, and costs of public communications that refer to any political party." An obvious problem is this rule applies in odd-numbered years when there are no federal elections. If later this November EMILY's List were to say "vote a straight Democratic ticket for the city counsel" in a broadcast in Walla Walla, Washington, no less than half of the cost would have to be expensed to a federal account, even though there is no federal race to influence. The FEC is explicit: if a communication mentions a political party, then context is irrelevant. *See* FEC Advisory Op. 2005-13, at 4–5 (Oct. 20, 2005) (the duty to "pay the costs of public communications that refer to a political party with at least 50 percent Federal funds does not change based on the activities of [the committee] in the particular State").

Contrary to this regulation's premise, moreover, certain "administrative expenses" do not always reflect a federal purpose, mixed or otherwise. A committee, for example, that opposes human cloning (and thus supports many different state and federal candidates and laws throughout the nation) may launch an outpost in a state that is considering an anti-cloning measure and organize a voter drive there,[6] even though the group has no intention of participating in any federal election. By this regulation, a full half of the costs

---

[6] A "generic voter drive" includes "any . . . activities that urge the general public to . . . support candidates . . . *associated with a particular issue*, without mentioning a specific candidate." 11 C.F.R. § 106.6(b)(1)(iii) (emphasis added). Thus, if a committee says "support candidates for the General Assembly who oppose human cloning" in an odd-numbered year, hard money is required.

must be expensed to the committee's federal account. In fact, the FEC would require the committee to use hard money for a leaflet that says "both Democrats and Republicans" endorse the initiative. Such a leaflet is not "generic party advertising," *McConnell*, 540 U.S. at 123; it is an ad for a state ballot initiative, not a political party, and it defies reason to say otherwise.[7] FECA does not require this absurdity.

The court says EMILY's List has waived part of its statutory claim. First, my colleagues concede EMILY's List has challenged every other subpart of these regulations, and agree the FEC has exceeded its statutory powers, but say because EMILY's List only mentions "administrative expenses" in one section of its brief, it waives its argument about "costs of generic voter drives" and "costs of public communications that refer to any political party." 11 C.F.R. § 106.6(c). This is so even though the clauses are in the exact same sentence of the exact same regulation, and even though they violate the exact same section of FECA for the exact same reason. This is perplexing. EMILY's List comprehensively says "[n]or are *the regulations* permitted by FECA. FECA was passed to regulate contributions and expenditures made with 'the purpose of influencing any election for Federal office.'" EMILY's List Br. at 17 (emphasis added). And if there is any doubt, EMILY's List

---

[7] "Generic party advertising" is not in the United States Code or the Code of Federal Regulations. It was used by the *McConnell* district court to mean, naturally, ads that support a party. *See* 251 F. Supp. 2d 176, 199 (D.D.C. 2003) (per curiam) ("[N]ational parties expended $14 million in nonfederal funds for 'generic' party advertising, consisting predominantly of television advertisements that did not mention candidates names, but urged viewers to simply vote for a particular party or stressed themes from the presidential campaigns."); *id.* at 654 (separate opinion of Kollar-Kotelly, J.) ("generic party advertising (that is, 'Vote Republican!')").

opens its reply brief by saying "*[t]he regulations at issue in this case* violate the First Amendment, *Chevron*[], and the Administrative Procedure Act." EMILY's List Reply Br. at 1 (emphasis added). EMILY's List also contends § 106.6(c) requires using hard money for ads that state "both Democrats and Republicans" support a measure. *Id.* at 16. It goes without saying that EMILY's List never argues "the regulations all violate FECA, except for the second and third clauses in the second sentence of 11 C.F.R. § 106.6(c)."[8]

Second and even more perplexingly, in order to buttress its waiver argument, the same judges that read *McConnell* narrowly as a case that "views political parties as different in kind than independent expenditure committees," Maj. Op. at 22, concludes EMILY's List could not have successfully challenged § 106.6(c)'s regulation of generic activities on statutory grounds because *McConnell* specifically approved regulation of contribution and expenditure limits for these funds. *Id.* at 41–42. If this were correct, it would mean the FEC can constitutionally regulate a committee like EMILY's List, and the court's constitutional analysis is critically undermined.

---

[8] Even if we assume EMILY's List has inadequately raised this issue, waiver is a prudential doctrine—not jurisdictional. *E.g.*, *Mitchell v. Fishbein*, 377 F.3d 157, 164–65 (2d Cir. 2004). And though my colleagues are mistaken on waiver, if they were truly concerned about this, we could order additional briefing. *E.g.*, *U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 444–48 (1993) (holding the D.C. Circuit did not err in ordering supplemental briefing on a subject not raised because "when an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law").

C.

No one disputes the FEC can craft bright-line rules. An "objective test," *Orloski v. FEC*, 795 F.2d 156, 162 (D.C. Cir. 1986), in fact, may be constitutionally required, *see FEC v. Wis. Right to Life, Inc*., 551 U.S. 449, 467–69 (2007) (opinion of Roberts, C.J.). Communications calling for the election or defeat of federal candidates certainly fall within the agency's authority, and the FEC may have a bit more leeway to regulate ads directed at federal electorates or aired during federal elections. *Shays*, 414 F.3d at 99. FECA's unambiguous text, however, forbids the Commission from doing what it has done here: promulgating proxies for "purpose" that wholly ignore all relevant contextual clues. The regulations consequently must be vacated as contrary to congressional will.

II.

A.

Because this case can be decided on statutory grounds, we need not reach the constitutional question, and so should not reach the constitutional question. Our precedent is not wishy-washy: "Federal courts should not decide constitutional questions unless it is necessary to do so. Before reaching a constitutional question, a federal court should therefore consider whether there is a nonconstitutional ground for deciding the case, and if there is, dispose of the case on that ground." *Kalka v. Hawk*, 215 F.3d 90, 97 (D.C. Cir. 2000). *See also Meredith Corp. v. FCC*, 809 F.2d 863, 870 (D.C. Cir. 1987); *United States v. Thomas*, 572 F.3d 945, 952 (D.C. Cir. 2009) (Ginsburg, J., concurring in part). My colleagues duck this rule, preferring to summon the awesome power of

*Marbury v. Madison*.  But in their eagerness to play John Marshall, they do not follow him.  The Great Chief Justice himself cautioned: "No questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act.  If they become indispensably necessary to the case, the court must meet and decide them," but if not, "a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed."  *Ex parte Randolph*, 20 F. Cas. 242, 254 (C.C.D. Va. 1833) (No. 11,558).

The reasons to be "keenly mindful of our institutional role" and "fully appreciate" the solemnity of constitutional adjudication are obvious.  *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2513 (2009).  Meekness, for one, compels us to recognize we are not the Constitution's only friend—each branch swears an oath to uphold it.  *See* U.S. CONST. art. II, § 1, cl. 8; *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981).  And if we misread a statute, Congress can fix it; not so with the Constitution.

The court, however, is not content just answering a gratuitous constitutional question.  Its holding is broader than even the plaintiff requests.  Instead of arguing nonprofits have a constitutional right to pay for ads attacking federal candidates with soft money, EMILY's List more modestly challenges the regulations as the "functional equivalent of spending limits, prohibiting EMILY's List from supporting *state and local candidates* in certain ways when its federal funds are exhausted" and claims they are not properly tailored because they "restrict vast amounts of *nonfederal activity*." EMILY's List Br. at 17 (summary of argument) (emphasis added).  The court holds, nonetheless, that EMILY's List is constitutionally entitled to pay 100% of the costs of its

advertisements out of a soft-money account, even for ads that attack or promote *federal* candidates. Maj. Op. at 28–29.[9]

Because EMILY's List's actual claims are not bold enough, the court *sua sponte* spins a more aggressive argument—making its waiver charge all the more curious. Nowhere does any party refer to Justice Blackmun's separate opinion in *California Medical Association v. FEC*, 453 U.S. 182 (1981) ("*Cal-Med*"). Nor does EMILY's List mention *FEC v. National Conservative PAC*, 470 U.S. 480 (1985) ("*NCPAC*"), *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986) ("*MCFL*"), or *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008)—in other words, the cases upon which the court's holding depends, *see, e.g.*, Maj. Op. at 11–16, 22–23, 26.[10] None of the law review

---

[9] Consistent with its briefing, during oral argument counsel for EMILY's List was more circumspect than the court is today:

> The Court: Would your position preclude say regulation of get out the vote drives, or voter registration, or that sort of thing? Do you think that would be beyond the FEC's purview?
>
> EMILY's List: No, Your Honor, we don't take that position, we take the position that reasonable regulations to account for the federal election related impact of that activity are permissible.

Tr. of Oral Arg. at 9. *Cf.* Maj. Op. at 27 ("[N]on-profits are constitutionally entitled to pay 100% of the costs of such voter drive activities out of their soft-money accounts.").

[10] In fact, EMILY's List does not mention *Cal-Med* until its reply brief, and neither party cites *Cal-Med* for a proposition integral to

articles the court relies on are cited—much less discussed—either.[11]   And far from hashing out *McConnell*'s "footnote 48," *id.* at 23 n.13, neither party mentions it.  The court today issues an expansive constitutional decision without the benefit of on-point briefing.   Before deciding a complicated First Amendment issue, we ought to ask for the parties' views.

In attempting to connect its decision to the parties' views, the court artfully re-imagines the "key question in this case," describing it as whether "non-profits [are] more like individual citizens (who under *Buckley* have the right to spend unlimited money . . . ) or more like political parties (which under *McConnell* do not)."  Maj. Op. at 40.  The court notes "*Cal-Med* was cited and discussed often in the briefs and at oral argument."  *Id*. at 41.  *Cal-Med* was cited and discussed by the parties, but never to support the proposition for which the court now relies on it.  For instance, when asked by the court to respond to the FEC's reliance on *Cal-Med*, counsel

the court's holding.  EMILY's List does cite, once, as a "see also," *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981), but for a background principle.  EMILY's List Br. at 23–24.  The FEC cites *MCFL* in a footnote for an immaterial point, FEC Br. at 23 n.17, but does not mention *NCPAC*, *Citizens Against Rent Control*, or *North Carolina Right to Life*.

[11] Many of the articles do not support the court, and not one squarely does.  *E.g*., Edward B. Foley, *The "Major Purpose" Test: Distinguishing Between Election-Focused and Issue-Focused Groups*, 31 N. KY. L. REV. 341, 344 (2004) ("[I]n my judgment contributions to political committees should be classified under the First Amendment with contributions to political parties . . . .");  Richard L. Hasen, Buckley *is Dead, Long Live* Buckley, 153 U. PA. L. REV. 31, 72 (2004)  (explaining that because of the "considerable deference" it displayed, "[l]ower courts showing fidelity to *McConnell* will have a difficult time striking down most campaign finance regulation").

for EMILY's List offered this succinct critique of the court's holding:

> The Court: Can you deal with [FEC's counsel's] response on [*Cal-Med*]?
>
> EMILY's List: Yes. I mean, *Cal*[-]*Med* is mysteriously produced here for the FEC's position. *Cal*[-]*Med* didn't raise any of the issues in this case. *Cal*[-]*Med* was a simple question of whether a committee that was making contributions to federal candidates had to observe a limit on contributions made to that federal program. That set a law now, that's certainly what EMILY's List does. I don't think it bears at all on this invasion of our state and local programs through the promulgation of these excessive federal regulatory schemes.

Tr. of Oral Arg. at 32–33. How true.

But even if it were judicially proper for me to do so, and even if the issues were briefed, I doubt I could join the court's opinion in full. This is not because I dislike its outcome. Indeed, I agree with what seems to be the unstated premise: if the Supreme Court's cases made any sense, the First Amendment would protect much more than pornography, profanity, and pyrotechnics. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000); *Cohen v. California*, 403 U.S. 15 (1971); *Texas v. Johnson*, 491 U.S. 397 (1989). The amendment's "purpose," after all, is "to

preserve an uninhibited marketplace of ideas in which truth will ultimately prevail," *FCC v. League of Women Voters*, 468 U.S. 364, 377 (1984)—a principle that "has its fullest and most urgent application to speech uttered during a campaign for political office," *Eu v. S.F. County Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989). If those beautifully fierce words "Congress shall make no law" are to do anything but condemn our constitutionalism as a failed experiment, then *at least* political speech in all its forms should be free of government constraint.

My colleagues' distaste for the FEC's handiwork is to their credit. It shows they take the First Amendment seriously. And they are right, of course, that if constitutional law were better acquainted with the Constitution, regulations such as these would never survive Article III scrutiny. If an advertisement criticizes the President of the United States, the Speaker of the House of Representatives, or the Chair of the Senate Committee on Foreign Relations, it can be a felony punishable by up to five years in prison to pay for that ad using money the federal government doesn't know about or that comes from sources the federal government deems to have already given enough. *See* 2 U.S.C. § 437g(d). The First Amendment, logically construed, cannot condone such a weighty burden on political speech at the same time it forbids penalizing the production of "virtual child pornography," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002).

I also agree with the court that "corruption" should only be understood in terms of *quid pro quo*—not a free-floating unease about money in politics. Once "corruption" is disconnected from "pay to play," Congress has *carte blanche* to stifle speech, a license that is particularly pernicious as our overweening government ever enlarges itself. Power— *government* power—is what generates passion in politics.

Money only measures its depth. The more power is at stake, the more money will be used to shield, deflect, or co-opt it. So long as the government can take and redistribute a man's livelihood, there will always be money in politics. One man's corruption is another man's political accountability.

But there is a rub. We sit on a lower court and "must follow the binding Supreme Court precedent" until the Court itself overrules it. *We the People Found., Inc. v. United States*, 485 F.3d 140, 144 (D.C. Cir. 2007). Though we do not read the court above's precedent unduly expansively, we also do not drag our feet: "it is not our role to fight a rear-guard action" against the logical implications of the Court's cases. *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008). Instead, we take its holdings as we find them, applying them to cover all they fairly address. *Stare decisis* means nothing if we only are bound by those cases with which we already agree. Like it or not, we cannot ignore Supreme Court precedent.

Modesty is dictated by the difficulty of applying *McConnell*'s facial generalizations to real world events. It is hard to say exactly how contribution limits on hybrid committees, like EMILY's List, should be analyzed after *McConnell*. *McConnell* involved a wide-ranging facial challenge addressing the constitutionality of BCRA. Trying to extrapolate from that case to this one is risky and reason enough to avoid the constitutional bog. Suffice it to say that the Supreme Court majority, the dissenters, and the commentators all have read *McConnell* as a maximalist opinion. *See* 540 U.S. at 192–93 ("[O]ur decisions in *Buckley* and *MCFL* were specific to the statutory language before us; they in no way drew a constitutional boundary that forever fixed the permissible scope of provisions regulating campaign-related speech."); *id.* at 263 (Scalia, J., dissenting)

("We have witnessed merely the second scene of Act I of what promises to be a lengthy tragedy."); *id.* at 264 (Thomas, J., dissenting) ("[T]he Court today upholds what can only be described as the most significant abridgment of the freedoms of speech and association since the Civil War."); *id.* at 294 (Kennedy, J., dissenting) ("This new definition of corruption sweeps away all protections for speech that lie in its path."); *id.* at 357 (Rehnquist, C.J., dissenting) ("Today's decision, by not requiring tailored restrictions, has significantly reduced the protection for political speech having little or nothing to do with corruption or the appearance of corruption."); *see also* Richard Briffault, *The 527 Problem . . . and the* Buckley *Problem*, 73 GEO. WASH. L. REV. 949, 970 (2005) ("*McConnell*, however, transformed the constitutional landscape.").

In both holding and discussion, the *McConnell* Court sided with the censor, going so far as to rely on theoretical anticipation to uphold a speech restriction, *see* 540 U.S. at 185 (upholding BCRA § 323(f), which forbids state and local officeholders and candidates from using soft money to support or attack federal candidates, based on the "eminently reasonable prediction that . . . state and local candidates and officeholders will become the next conduits for the soft-money funding of sham issue advertising"), and ending with an invitation for even more congressional action, *id.* at 224 ("We are under no illusion that BCRA will be the last congressional statement on the matter."). This is not the *modus operandi* of a tentative tribunal; the Court knew what it was doing, and said so. After *McConnell*, if these regulations are within the FEC's statutory power, then there is no obvious reason they *facially* violate the First Amendment.[12]

---

[12] This a facial challenge. For such claims, "exercising judicial restraint . . . frees the Court not only from unnecessary

It is true *McConnell* upheld, against an equal protection challenge, a provision of BCRA regulating political parties. But regulation of political parties is not *McConnell*'s theme. The Court broadly recognized and deferred to governmental interests in preventing corruption, the appearance of corruption, and circumvention of election regulations. *McConnell*, 540 U.S. at 136–37, 143–45, 152–53. Arguably, this expansive corruption/circumvention/conduit rationale is broad enough to encompass some limits on independent expenditure committees, particularly for those political committees with a self-proclaimed electoral mission. *See* Briffault, 73 GEO. WASH. L. REV. at 986–87; Hasen, 153 U. PA. L. REV. at 67–68. EMILY's List is a multicandidate political committee that has as its primary purpose electing ideologically compatible candidates, EMILY's List Br. at 3. [13]

pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." *Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1190–91 (2008). As a rule, a law is facially repugnant only if it "is unconstitutional in all of its applications," but there is a narrow First Amendment exception where "a law may be overturned [if] a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *id.* at 1191 n.6. Those seeking this "strong medicine," *id.*, however, face a "heavy burden," *McConnell*, 540 U.S. at 207.

[13] In defining its mission, EMILY's List explains that it "is committed to a three-pronged strategy to elect pro-choice Democratic women: recruiting and funding viable women candidates; helping them build and run effective campaign organizations; and mobilizing women voters to help elect progressive candidates across the nation." EMILY's List, Our Mission, http://emilyslist.org/about/mission/ (last visited Aug. 28, 2009).

As such, it supports Democratic candidates for federal office. *See* Matthew B. Stannard, *Cash is Key for Tauscher's Replacement*, S.F. CHRON., Aug. 24, 2009, at A1, *available at* 2009 WLNR 16474721 (noting that a candidate in a federal primary race "has touted the endorsement of EMILY's List, a national fundraising organization that supported [former U.S. Representative Ellen Tauscher] and backs Democratic women who support abortion rights."). Thus, EMILY's List is much more like a political party than the Sierra Club or the Society for the Prevention of Cruelty to Animals.

Whether, under the high court's current precedents, EMILY's List could be regulated exactly like a political party is unknown. That it should not be regulated *more harshly* than a political party seems to be the committee's complaint with the FEC regulations challenged in this court. EMILY's List Br. at 39 ("Bizarrely, [the regulation] also treats nonparty PACs more harshly than any other type of committee, save national parties and candidates themselves."). My point is not that *McConnell* mandates such treatment; only that nothing in the opinion's logic clearly precludes it. The court does not think this is "a persuasive interpretation of *McConnell*." Maj. Op. at 38. Perhaps the court is right. But reading the case, as the court does, to sanction First Amendment immunity for all non-connected nonprofits seems even more implausible.

B.

Precedent holds allocation and solicitation rules are contribution limits. This is key, as such limits receive less than "strict scrutiny," given they "'entail only a marginal restriction upon the contributor's ability to engage in free communication.'" *McConnell*, 540 U.S. at 134–35 (quoting *Buckley*, 424 U.S. at 20)). The "'overall effect' of dollar limits on contributions is [also] 'merely to require candidates

and political committees to raise funds from a greater number of persons.'" *Id.* at 136 (quoting *Buckley*, 424 U.S. at 21–22). Unlike strict scrutiny, which requires narrow tailoring to serve compelling governmental interests, a contribution limit is "valid [if] it satisfies the lesser demand of being closely drawn to match a sufficiently important interest." *Id.*

After *McConnell*, allocation and solicitation rules are subject only to this lesser scrutiny. Facing BCRA § 323(a), which forbids national parties from soliciting and spending soft money, and § 323(b), which forbids state parties from spending soft money on "federal election activities," the Court declined to apply strict scrutiny. 540 U.S. at 138–39. The Court held "neither provision in any way limits the total amount of money parties can spend. Rather, they simply limit the source and individual amount of donations. That they do so by prohibiting the spending of soft money does not render them expenditure limitations." *Id.* at 139. We instead ask "whether the mechanism adopted to implement the contribution limit, or to prevent circumvention of that limit, burdens speech in a way that a direct restriction on the contribution itself would not." *Id.* at 138–39. Using the Court's standard, I agree with the district court that while the FEC's regulations "may affect the manner in which EMILY's List must fund the speech in which it chooses to engage, they do not in any way limit the political speech that EMILY's List may undertake." *EMILY's List*, 569 F. Supp. 2d at 39.

The issue we confront then is whether these regulations, facially, are closely drawn to match an important interest. To answer, we again ought to look to *McConnell*. In upholding BCRA § 323, the Court noted the "interests that underlie contribution limits—interests in preventing both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through

the appearance of corruption." *McConnell*, 540 U.S. at 136. The Court bluntly held these interests are "not limited . . . to the elimination of cash-for-vote exchanges," but "extend to the broader threat from politicians too compliant with the wishes of large contributors." *Id*. at 143. Congress must be able to "address [these] more subtle but equally dispiriting forms of corruption" by "remov[ing] the temptation" of "large financial contributions." *Id.* at 153. To combat "cynical assumption[s]," Congress can "regulate the appearance of undue influence," with "undue influence" defined as "a sense of obligation" or "grat[itude]," *id.* at 144–45. Importantly, Congress also has an interest in preventing the circumvention of these limits—and so can use broad prophylaxes—because "candidates, donors, and parties test the limits of the current law." *Id.* at 144. In sum, *McConnell* defines the "interest" so broadly it is hard to imagine regulations that are not properly drawn to it. *See id.* at 356–57 (Rehnquist, C.J., dissenting).

Following from such an encompassing statement of the interest, the *McConnell* Court facially upheld many onerous restrictions on the use of soft money. The Court emphasized, for example, that even a complete ban on soliciting nonfederal funds would still "leave open ample opportunities for soliciting federal funds," and noted such restrictions "increase the dissemination of information by forcing parties, candidates, and officeholders to solicit from a wider array of potential donors." *Id.* at 139–40. The Court also upheld a ban on any use of soft money by national parties, even for those "minor parties" that are unlikely to have any tangible electoral success, remarking only that "a nascent or struggling minor party can bring an as-applied challenge if § 323(a) prevents it from amassing the resources necessary for effective advocacy." *Id.* at 159. While national parties do not always act on behalf of or in concert with federal candidates, a prophylactic prohibition on any soft money spending and

soliciting by them is facially valid, given the "close connection and alignment of interests" between national parties and federal candidates. *Id.* at 155.

The Court's discussion of national parties by itself raises difficulties for the court, especially because the Court already seemingly has held there is a "close connection and alignment of interests" between committees like EMILY's List and federal candidates. In *Cal-Med*, the Court sustained contribution limits to multicandidate committees. Four justices adopted the Conference Report's conclusion that these committees may "'appear to be separate entities pursuing their own ends, but are actually a means for advancing a candidate's campaign,'" 453 U.S. at 199 n.18 (plurality opinion) (quoting H.R. Conf. Rep. No. 94-1057, pp. 57–58 (1976)). Justice Blackmun penned a concurring opinion, but did not disclaim the Conference Report or disagree with the Court's ultimate holding. In fact, he expressly said "*contributions to multicandidate committees may be limited to $5,000 per year* as a means of preventing evasion [of contribution limits]," though he noted in *dicta* that his conclusion would be different if the committee "makes *only* independent expenditures" and so does not "pose a perceived threat of actual or potential corruption." *Id.* at 203 (opinion of Blackmun, J.) (emphasis added). If Congress can forbid all allocation and solicitation of soft money by national parties, how is it unconstitutional to forbid only some allocation and solicitation of soft money by multicandidate committees that are also closely aligned with federal candidates?

The court disputes this reading of *Cal-Med*, claiming there are not just two types of political committees (ones that only make independent expenditures, and all others), but actually three: (1) those that only make independent

expenditures; (2) those that only contribute to candidates; and (3) those that make independent expenditures *and* contribute to candidates. Such political committees are, in the court's view, entitled to raise and spend "unlimited money" for advertisements, get-out-the-vote efforts, and voter registration drives. Maj. Op. at 26. If these hybrid committees contribute to federal candidates, they must use hard money, says the court, but all other spending can be with soft money.

This novel argument is not without considerable charm, but one must read *Cal-Med* with a squint to see that holding.[14] There is no indication in *Cal-Med* that the committee did not make independent expenditures, but the Court still sustained the statute, without announcing the distinction the court draws today. The Court *has* consistently cited *Cal-Med* for the unqualified proposition that it is constitutional to limit contributions to multicandidate committees. *See, e.g.*, *FEC v.*

---

[14] The court relies heavily on Justice Blackmun's concurring opinion in *Cal-Med*, arguing that it is controlling. But the opinion is controlling, if at all, only for "points that can be said to be fairly subsumed within the reasoning of the plurality." John C. Eastman, *Strictly Scrutinizing Campaign Finance Restrictions (and the Courts that Judge Them)*, 50 CATH. U. L. REV. 13, 37 (2000); *see Marks v. United States*, 430 U.S. 188, 193 (1977). This circuit has clarified it is only the narrowest opinion's overlap with the broader opinion that counts. "*Marks* is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions. In essence, the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc). Presumably then, the controlling part of Justice Blackmun's opinion is the holding that the FEC may constitutionally regulate contributions to fund independent political expenditures without contravening the First Amendment—no more and no less.

*Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 441–42 (2001); *FEC v. NRA Political Victory Fund*, 513 U.S. 88, 97 (1994). *See also Buckley*, 424 U.S. at 38.

The infamous "footnote 48 of the *McConnell* opinion," Maj. Op. at 23 n.13, also flatly contradicts the court:

Justice KENNEDY's contention that *Buckley* limits Congress to regulating contributions to a candidate ignores *Buckley* itself. There, we upheld FECA's $25,000 limit on aggregate yearly contributions to candidates, *political committees*, and *party committees* out of recognition that FECA's $1,000 limit on candidate contributions would be meaningless if individuals could instead make "huge contributions to the candidate's political party." Likewise, in [*Cal-Med*], we upheld FECA's $5,000 limit on contributions to multicandidate political committees. It is no answer to say that such limits were justified as a means of preventing individuals from using parties and political committees as pass-throughs to circumvent FECA's $1,000 limit on individual contributions to candidates. Given FECA's definition of "contribution," the $5,000 and $25,000 limits restricted not only the source and amount of funds available to parties and political committees to make candidate contributions, but also the source and amount of funds available to engage in express advocacy and numerous other noncoordinated expenditures. If indeed the First Amendment prohibited Congress from regulating contributions to fund the latter, the otherwise-easy-to-remedy exploitation of parties as pass-throughs (e.g., a strict limit on donations that could be used to fund candidate

contributions) would have provided insufficient justification for such overbroad legislation.

*McConnell*, 540 U.S. at 152 n.48.

That the Court may have created a doctrinal anomaly might suggest, as the court argues, *see* Maj. Op. at 23 n.13, that it could not possibly have meant what it said, but that is a hard argument to make. Often cases are in tension as doctrine works itself pure. Our duty as an intermediate court is not to tell the Court what it ought to have said, but to abide by what it did say.

But even leaving aside its treatment of national parties, *McConnell* further undermines the court. Recognizing the dynamic—indeed, Sisyphean—character of campaign finance law, the Court noted "[m]oney, like water, will always find an outlet." 540 U.S. at 224. Upon realizing structural forces inherent in a republic inevitably create incentives for those subject to regulation to petition for relief and to campaign against those who are disinclined to grant it, the Court did not retreat to a more manageable and less burdensome "*quid pro quo*" standard. *Id.* at 296 (Kennedy, J., dissenting). Instead, after upholding § 323(a), the Court emphasized money would now "corrupt" federal races by other, more subtle routes, so Congress, in anticipation of this new corruption, can enact broad anti-circumvention measures. *E.g.*, *id.* at 165–66. Indeed, without pointing to *any* evidence that local officials (*e.g.*, county assessors) are connected to federal candidates (*e.g.*, for President of the United States) or have been used to circumvent the law, the Court held Congress prophylactically can regulate them without facially offending the Constitution. *See id.* at 184–85. If the First Amendment is flexible enough to allow regulating local officials because contributions *might* flow through them to federal candidates, then why can't the

FEC also make an "eminently reasonable prediction" that committees like EMILY's List—which *actually* do campaign for candidates and give them money[15]—will be the next route for corruption, and regulate accordingly? *Id.* at 185.

The court sidesteps *McConnell* by saying EMILY's List is a nonprofit, not a political party, and so has more constitutional rights.[16] But EMILY's List is not just a nonprofit; it is a multicandidate political committee that campaigns for and contributes money to federal candidates. In upholding § 323 in full, including § 323(f), *McConnell* blessed restrictions on local officeholders, who are not, of course, political parties. The rule then cannot be that parties and federal candidates are in one column, and everyone else is in another, because that does not explain *McConnell*. Instead, there is a spectrum, *N.C. Right to Life*, 525 F.3d at 291, so we should ask not whether an entity is a nonprofit, but instead where it falls on the spectrum. Specifically, is EMILY's List more or less likely than a local official to act as a conduit to federal candidates? "Common sense" says such committees

---

[15] Britt Cocanour, EMILY's List Chief of Staff, avowed her committee "has helped to elect sixty-eight Democratic women to Congress, thirteen to the U.S. Senate, eight to governorships, and over 350 to other state and local offices." Joint Appendix at 70.

[16] The court suggests *McConnell* guarantees "'interest groups'" the right "'to raise soft money to fund voter registration, GOTV activities, mailings,' and advertising." Maj. Op. at 22 (quoting 540 U.S. at 187). But *McConnell* only notes BCRA can treat interest groups differently than parties without violating Due Process. *See* 540 U.S. at 188. There is a difference between noting Congress has not regulated and holding Congress cannot regulate. *See N.C. Right to Life*, 525 F.3d at 333–34 (Michael, J., dissenting) (discussing *McConnell*'s reference to "interest groups").

are the more natural path to "corruption," *McConnell*, 540 U.S. at 297 (Kennedy, J., dissenting), but if my colleagues are correct, Congress cannot regulate them the same way it regulates county directors of animal control.[17] Precedent is plain: local officials must use hard money to attack federal candidates, *see id.* at 184–85, but as the court now resolves this case, multicandidate political committees cannot be so limited. Can that be right?

The court's opinion is boldly creative, and will, if followed, have profound results on campaign finance regulation. This case means:

1. Multicandidate political committees can spend unlimited amounts of soft money to run ads attacking or supporting federal candidates and political parties.
2. These committees can spend unlimited amounts of soft money on get-out-the-vote activities that support federal candidates and political parties.
3. These committees can solicit soft money by saying: "Just like you, we want [*federal candidate*] to win. You have already donated all the law allows to [*federal candidate*], but there is no limit on how much you can give to us to support [*federal candidate*]."
4. Congress can do nothing about any of this.

These results are in tension—perhaps irreconcilable tension—with *McConnell*.

---

[17] Though these regulations go further than BCRA § 323(f), by the court's opinion, it would not matter if they were exactly the same: nonprofits are categorically distinct. *See* Maj. Op. at 22.

C.

Recall how the Court in *McConnell* concluded *its* opinion: "'To say that Congress is without power to pass appropriate legislation to safeguard an election from the improper use of money to influence the result is to deny the nation in a vital particular the power of self protection.'" 540 U.S. at 223–24 (quoting *Burroughs v. United States*, 290 U.S. 534, 545 (1934)). This "conviction" compelled the Court to uphold "Congress's most recent effort to confine the ill effects of aggregated wealth on our political system" by "control[ing]. . . soft money." *Id.* at 224. But the Court was "under no illusion that BCRA will be the last congressional statement on the matter"—"[m]oney, like water, will always find an outlet." *Id.*

While I have argued courts should not unnecessarily assail legislative acts, political speech is the core of what the First Amendment protects. From *Buckley* to *McConnell* the Court has relied on an *ad hoc* empiricism ill-suited to the complex interactions of democratic politics. The government has unlimited resources, public and private, for touting its policy agenda. Those on the outside—whether voices of opposition, encouragement, or innovation—must rely on private wealth to make their voices heard. An increasingly anomalous campaign finance jurisprudence only impoverishes this essential debate. *McConnell*'s careless invocation of access and influence (two integral aspects of political participation) as synonyms for corruption is instructive. Such an expansive, self-referential, and amorphous definition of corruption, coupled with lax standards of scrutiny and a willingness to accept as "evidence" any plausible theory of corruption or claim of circumvention, is likely to doom any argument for protection of core political speech. Someday the Supreme

Court may be persuaded to reconsider this approach.  But that cannot be our task.

\* \* \*

This should have been a straightforward application of administrative law, not unlike countless agency cases decided by this circuit every year.  Congress has enacted a statute; the agency has violated it; the rules must be vacated; done.  I would enforce the statute as written and call it a day.  A good rule of thumb is we often do more for the law when we do less with the law.  Per that rule, I concur only in part with the court's opinion.